[Crim. No. 11332.   In Bank.   Dec. 23, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. GERALD ALBERT BEIVELMAN, Defendant and Appellant.

Gerald Albert Beivelman, in pro. per., and Howard A. Potts, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Charles P. Just, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—A jury found defendant guilty of first degree robbery, first degree burglary, and first degree murder of Sylvera Marie McGraw. It fixed the penalty for murder at death. Sentences on the robbery and burglary counts were stayed pending final determination of this automatic appeal (Pen. Code, § 1239, subd. (b)).

*Facts*: The victim and her husband owned and operated a liquor store known as the Bank Bottle Shop, located in a shopping center in Sacramento. Mr. McGraw operated the store on week days, and it was customary for Mrs. McGraw to operate the store alone on Sundays, as she did on Sunday, March 12, 1967, the day of her death. She was alive and alone in the store a few minutes before 3 p.m. when a customer, Mr. Nyquist, made a purchase.

Shortly after 3 p.m. Mr. Wendell C. Olson passed the Bank Bottle Shop on his way to the premises next door. He saw an unoccupied, cream-colored Thunderbird automobile parked in front of the bottle shop with the engine running. Mr. Olson did not look into the bottle shop and heard no noises coming therefrom.

Francesca Lee, 11 years of age, went to a grocery store in the shopping center on March 12 on an errand for her mother. As she walked past the Bank Bottle Shop she saw ''a pair of legs lying down on the floor'' with blood on them. Returning from the grocery store approximately five minutes later, she again passed the bottle shop on her way home. At that time she saw a man in front of the bottle shop coming from the direction of the door, get into a car parked in front of the shop and drive away. He had blood on him and was carrying a hammer. He appeared to have an injured leg, as he was limping and almost fell as he got into the car. The car accelerated rapidly as it drove away and scraped the curb.

Francesca looked into the store and saw the same pair of legs in the same place that she had observed earlier. She thought it was about 3:25 p.m. when she left her home to go to the store. She subsequently reported what she had seen to the

police on that same day. She told the officers she did not think she could recognize the man she had seen because of the amount of blood on his face. The man was described to the officers by Francesca as having dark brown hair, about 5 feet 8 or 5 feet 10 inches tall, weighing about 150 pounds, having narrow shoulders and a medium build. She identified defendant at a police lineup and at the trial.

At approximately 3:15 p.m. on March 12, Donald E. Haskin, an employee of a grocery store in the shopping center, having been informed by a neighborhood boy that something was wrong at the bottle shop, went to the shop. Through the glass door he observed someone on the floor covered with blood. The person appeared to be badly hurt and was rocking back and forth. Haskin called the police, who arrived in approximately five minutes. There was no automobile in front of the shop when Haskin was there.

At 3:21 p.m. on March 12, 1967, Officer Spurgin of the Sacramento Police Department received a radio call in his patrol car to proceed to the bottle shop, and arrived there at 3:25 p.m. He made a preliminary examination of the premises, determined that the victim was dead, observed deep wounds on the victim's head and a great amount of blood on and surrounding the body. There was considerable evidence of a struggle having taken place, including broken wine bottles and a pair of broken glasses. A man's white rain hat was on the floor; blood, type O, was found on it, and also, human hair that could not be distinguished from defendant's hair. The drawer of the cash register was open, with blood on the front and top of the cash register.

Between 3:30 and 4:30 p.m. on March 12, Mr. and Mrs. Albert J. Shuman were driving on Freeport Boulevard near Florin Road. As the Shumans turned off Florin Road and headed north on Freeport Boulevard they saw a 1962 Thunderbird automobile, white or cream-colored, stopped on the right-hand side of the road. They recognized the make and model of the car because they own one like it. The sole occupant of this car was pushing or throwing articles out of the window on the passenger's side toward a ditch alongside the road. Mr. and Mrs. Shuman were disturbed by this "litterbugging" activity and memorized the license number of the car, JRX 522. Mrs. Shuman, who was driving, glanced at the occupant of the Thunderbird as she passed it and noticed that he had dark hair and looked pale, as if he were ill. Mr. Shuman paid particular attention to the driver of the Thunderbird, who appeared to be "awfully pale," and it was Mr.

Shuman's impression that the man was ill. After seeing a television news broadcast concerning the murder and robbery, the Shumans reported their observations to the police. Mr. Shuman subsequently identified defendant at a police lineup and made an in-court identification.

At approximately 4 p.m. on March 12, Betty Barham was standing at the doorway of her apartment at 2520 S Street, Sacramento, talking with a neighbor when a light colored car drove up and a young man got out. He appeared to have an injured leg and was hopping on one foot. He fell down, and when Mrs. Barham asked if she could be of help he asked her to call his brother-in-law, Ron Silva. Mr. Silva arrived and carried the man to the Silva's apartment at 2530 S Street.

In the early morning of March 14 officers of the Sacramento Police Department went to the location on Freeport Boulevard given them by Mr. and Mrs. Shuman, near a golf course, and recovered various items of clothing, including a shirt, a blue jacket, trousers, socks, a hammer,[1] some blue paper towels, and a paper sack. There was blood on all the clothing except the socks, the blood being classified as human, type O. The hammer was identified by Francesca Lee as being like the one carried by defendant as he left the front of the bottle shop. Human hair was discovered on the hammer that could not be distinguished from the hair of the victim, Mrs. McGraw. Hair discovered on the shirt was the same as, and could not be distinguished from, defendant's hair. Hair discovered on the pants was similar to defendant's hair; additional hair on the pants was similar to the victim's hair. There was a strong odor of wine about the clothing, particularly the shirt. The shirt, pants, and blue jacket were identified as being the same in appearance as clothing worn by defendant during February 1967.

The clothing worn by the victim at the time of the murder was saturated with blood, which was determined to be type O, and there was an odor of wine about her clothing.

An autopsy performed by Dr. MacDonald, autopsy surgeon for the coroner's office, revealed that Mrs. McGraw had suffered approximately 50 to 70 wounds about the head, arms and legs. All wounds of medical significance were in the area of the scalp. There was a major wound across the forehead at

---

[1]The object referred to as a "hammer" was identified as a wheel weight tool, commonly used to put weights on automobile wheels to balance them. It was described as having a face like an ordinary hammer, but instead of claws as on a claw hammer, there were sharp, prong-like projections on the sides and top of the hammer.

the hairline that penetrated through the skull, an explosion type wound on the right side of the head behind the ear, and a similar wound on the back of the skull. At the left end of the forehead wound there was an unusual puncture type wound. There were three general types of wounds, jagged lacerations, small punctures, and explosion-type wounds.

After the hammer was recovered by the police, Dr. MacDonald re-examined the deceased to compare the size and shape of her wounds with the projections on the hammer. The shapes of the various protuberances and surfaces of the hammer fitted precisely the wounds inflicted upon the victim. Dr. MacDonald testified that the cause of death was "a combination of blood loss, externally, and concussion, secondary to multiple wounds about the head." The victim had bled profusely, with the result that there was very little blood left in her body; the heart and major vessels were essentially empty. Some wounds had been inflicted after the victim had ceased to struggle.

The day after Mrs. McGraw was murdered, Dr. Max D. Shaffrath treated defendant for a fractured right knee. Defendant was on crutches, and there was considerable swelling about the knee. The doctor diagnosed his condition as a fracture of the thigh bone, extending into the knee; there was no displacement of the bone. There was no wound or laceration on the leg, and a cast extending from the groin to the ankle was applied. It was Dr. Shaffrath's opinion that the fracture could have been the result of a fall from a standing position onto a hard surface. Defendant told the doctor that he had fallen on his leg while in a service station on Florin Road.

The following day at approximately 9:15 a.m. Officer Rodney L. Johnsen of the Sacramento Police Department was notified that an ambulance had been requested at apartment 1, 2530 S Street. He proceeded to that address and was admitted by Mrs. Bonni Silva, defendant's sister. Defendant was unconscious on a mattress on the living room floor. The officer identified defendant and took him into custody. The ambulance arrived, and defendant was transported to the hospital. Officer Johnsen followed the ambulance in his patrol car, remained with defendant at the hospital, and was present when a blood sample was taken from defendant. Defendant was examined by doctors at the hospital, and no wounds or lacerations other than some minor scratches were discovered.

A 1962 Thunderbird automobile with California license plate JRX 522 was located in the parking lot at 2530 S Street

(the parking lot adjacent to the Silvas' apartment building). Pursuant to a search warrant, this automobile was searched by the police. The automobile was registered to defendant's father. Human blood, type O, was discovered in the automobile. Paint removed from one of the tires of the Thunderbird matched paint scrapings removed from the curb in front of the Bank Bottle Shop where Francesca Lee saw a car scrape the curb. Defendant's fingerprints were found in the car.

The victim's husband, Dana E. McGraw, testified that between $87 and $90 was taken in the robbery of his liquor store on March 12, 1967. He testified that the hammer discovered in the field adjacent to Freeport Boulevard was not familiar to him and was not used by him or his wife in their store. He had never before seen the blue paper towel found by police officers at the scene of the crime.

The prosecution presented no additional witnesses at the penalty phase of the trial although certain additional documentary evidence was introduced. It was agreed that the jury could consider all the evidence that had been presented at the guilt phase of the trial. The defense offered the following testimony in mitigation:

Captain J. Bruce Guthrie of the Sacramento Police Department testified that on July 24, 1956, he arrested defendant in the restroom of a service station and that defendant was in possession of narcotics paraphernalia.

Edwin Goman, a pharmacist, testified that in February 1959 defendant robbed his pharmacy, that defendant was armed with a revolver at the time, and that he stole only narcotics.

Detective Edward Burt of the Sacramento Police Department testified that he arrested defendant in connection with the robbery of Goman's Pharmacy and that defendant stated to him at that time that he was using narcotics. A narcotics kit was discovered in connection with this arrest.

Leo Owen, a parole agent with the California Youth Authority, testified that defendant was received in custody by the authority on May 8, 1959, and released on June 28, 1960, at which time he was placed on parole. Parole was subsequently terminated because of defendant's commitment to the Department of Corrections.

On July 17, 1962, defendant was arrested on a narcotics (heroin) charge and subsequently convicted and sentenced to prison. He was received by the Adult Authority on August 15, 1962, and released on parole on August 15, 1966. His

parole was canceled on March 15, 1967, relative to the present offense.

Officer Robert W. Jensen of the Bureau of Narcotic Enforcement testified that on July 17, 1962, defendant dived into a glass window in the Sacramento County jail from a room three floors above the ground, breaking the glass and injuring himself.

Detective Walter Ford of the Sacramento Police Department testified that when the Thunderbird automobile was examined after defendant's current arrest, a garden hose was found therein with the ends taped in such a manner that it could be used to carry carbon monoxide fumes from the exhaust system into the interior of the automobile. At the time of his current arrest marijuana and a narcotics paraphernalia outfit containing traces of an opiate narcotic were found in defendant's personal possessions.

Dr. John A. Mitchell, a psychiatrist, testified that he examined defendant on May 24, 1967, for approximately two hours. Based solely on what defendant told him, it was his opinion that defendant was a narcotics addict at the time of his examination and that he had a history of narcotics addiction going back to his use of marijuana at the age of 13 and of heroin at the age of 15. Defendant engaged in a suicide attempt by taking an overdose of barbituates shortly before his current arrest.

Dr. James R. Richmond, a psychiatrist, examined defendant on June 12, 1967, for the purpose of determining his sanity. Dr. Richmond's conclusion, based upon his examination, which lasted an hour and fifteen minutes, was that defendant "may be suffering from a mental disorder."

Defendant contends:

First, *that the trial court abused its discretion in failing to suspend the proceedings in order to determine his sanity, as required by section 1368 of the Penal Code.*[2]

There is no merit to this contention. The rules for the application of section 1368 of the Penal Code were recently revised by this court in *People* v. *Pennington,* 66 Cal.2d 508

---

[2]Section 1368 reads: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity."

[58 Cal.Rptr. 374, 426 P.2d 942], in light of the United States Supreme Court decision in *Pate* v. *Robinson,* 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836], which held that where the uncontradicted evidence raised a bona fide doubt as to a defendant's competence to stand trial the court's failure to make an inquiry as to his incompetence deprived him of his constitutional right to a fair trial. We concluded that the procedure theretofore approved by us, which permitted the trial judge to resolve conflicting evidence against a doubt of present insanity, was unconstitutional as applied where a defendant has come forward with substantial evidence of incompetence to stand trial. (66 Cal.2d at p. 516 [4b].) We further said: "*Pate* v. *Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence— testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary." (*Id.* at p. 518.)

The *Pennington* case laid down these rules:

■ (1) When a defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right, and the trial judge has no discretion to exercise. (*Id.* at p. 518 [5b].)

(2) The substantial-evidence test is satisfied "If a psychiatrist or qualified psychologist . . . who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel. . . ." (*Id.* at p. 519 [8].)

■ (3) "When the evidence casting doubt on an accused's present sanity is less than substantial, *People* v. *Merkouris, supra,* 52 Cal.2d 672, 678-679 [344 P.2d 1], correctly states the rules for application of section 1368 of the Penal Code. Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal." (*Id.* at p. 518 [5b].)

Applying the foregoing rules to the facts of the instant case, the record shows that Dr. James R. Richmond examined defendant on June 12, 1967, during an evening adjournment of the guilt phase of the trial. The next day defense counsel told the court: "Last afternoon after our court session, the defendant and I again discussed matters in connection with this case, and because of the conversation I had with him, I had him examined last night by an additional psychiatrist, Dr. Richmond.

"And I have the oral report of Dr. Richmond which I don't wish to reveal. But, it is such that I feel that we—we can proceed with the trial at this time."

At the penalty phase of the trial, Dr. Richmond testified that the purpose of his examination was "to attempt to assess [defendant's] sanity at the time of the commission of the crime, and his current sanity." His examination lasted approximately one hour and fifteen minutes, and the opinions and conclusions reached by Dr. Richmond were based primarily on what defendant told him during the examination plus some preliminary information supplied by defendant's trial counsel. Dr. Richmond described the examination as having the atmosphere of a "cat and mouse" game, in that defendant tried to be manipulative during the examination to convince the examiner of his lack of sanity. He testified that he considered the possibility that defendant was feigning symptoms of delusion and whenever defendant gave him an indication of something that sounded strongly suggestive of mental illness he would follow up his questioning to try to get defendant to expand on whatever it was that sounded ill to him. Defendant would then apologize and say, "Perhaps I expressed myself badly," and would come back with more rational responses and give totally appropriate answers. Dr. Richmond had an opinion that defendant might be suffering from a mental disorder and also that he might not be.

Dr. John A. Mitchell testified that he examined defendant on May 24, 1967, for two hours and that his opinion, based solely on what defendant told him during this interview, was that defendant was a narcotics addict and had made a good adjustment to prison life during previous periods of incarceration despite the fact that such incarceration had eliminated his narcotics supply.

In addition to the medical testimony, defendant relies upon "unusual outbursts during his counsel's arguments to the jury" as indicative of his mental disorder. The record shows that during the entire course of his 10-day trial, defendant

spoke out a total of seven times and engaged in audible laughter on a single occasion.[3] These interruptions, neither singly nor collectively, constitute "outbursts" and do not support defendant's contention of mental incompetence. (Cf. *People* v. *Kroeger,* 61 Cal.2d 236, 243-244 [1a, 1b] [37 Cal.Rptr. 593, 390 P.2d 369].)

The above testimony of the psychiatrists fails to satisfy the substantial evidence test enunciated in *People* v. *Pennington, supra,* 66 Cal.2d 508, 519 [8], and defendant was therefore not entitled to a section 1368 hearing as a matter of right. Neither Dr. Richmond nor Dr. Mitchell expressed any opinion on defendant's ability to assist in his defense, to cooperate with counsel, or of his ability to understand the purpose or nature of the criminal proceedings against him. Dr. Richmond's testimony was indefinite and equivocal, and Dr. Mitchell's testimony was merely that defendant had a history of narcotics addiction. The evidence in this case being less than substantial, it was within the discretion of the trial court whether to order a sanity hearing, and in light of the record it cannot be said that there was an abuse of discretion. (*People* v. *Laudermilk,* 67 Cal.2d 272, 285 et seq. [5] [61 Cal.Rptr. 644, 431 P.2d 228].)

Second, *that it was prejudicial error for the court to refuse to instruct the jury on second degree murder.*

There is no merit to this contention. Murder committed in

---

[3]When Mr. Haskin was testifying to what he observed when he looked through the front door of the liquor store and was describing the position of the victim's body, defendant said, "What is this, if you pardon me? I don't see any logic here."

While the court and counsel were discussing the admissibility of the numerous exhibits, particularly a photograph of the interior of the liquor store where deceased met her death, defendant said, "What is this? Come on. Come on. Let's go." Moments later he said, "May I be excused from this, please?" and "May I say something to the Court?" To this latter question, the court replied, "You better discuss it privately with your counsel." Defense counsel thereafter consulted with defendant, and the next day counsel said, ". . . toward the end of the afternoon session the defendant requested the Court's permission to—to direct some remarks to the Court. And I asked him to wait until I had a chance to talk to him before he—and discuss what he wanted to say. We have discussed it, and I believe now that he desires to proceed without addressing the Court. Is that correct, Mr. Beivelman?" Defendant replied, "That's right."

During defense counsel's argument to the jury in referring to the injuries sustained by the victim, defendant said, "May I be excused for a minute? I am sorry to interrupt your——" At another point in argument when defense counsel referred to Dr. Mitchell's testimony that defendant had used narcotics, defendant said, "This is all nonsense." And when defense counsel remarked that defendant "has a tormented mind and soul," the transcript shows "(Defendant laughing.)"

the perpetration of robbery or burglary is murder of the first degree. (Pen. Code, § 189.) The court so instructed in this case. The court also instructed that "Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree." (CALJIC 302-B.) This instruction was approved in *People* v. *Riser,* 47 Cal.2d 566, 581 [18] [305 P.2d 1].)

Defendant contends that he was entitled to a second degree murder instruction because "there was no positive testimony to negate a finding that appellant's intent to steal from Mrs. McGraw did not arise until after her death." Defendant is in error as to both the facts and the law.

■ The evidence establishes that defendant entered the Bank Bottle Shop armed with a deadly weapon; that he left the engine of his automobile running while he entered the store; that he was dressed so as to facilitate a quick change of appearance (shirt, sweater and jacket); that he had a change of clothes in his car; and that he took paper towels into the store with him. The clear import of this evidence is that defendant entered the store with the intent to commit robbery; that he was armed to carry out his purpose; and that he attempted to minimize the possibility of subsequent identification through fingerprints, which could be wiped away with the paper towel, or recognition, by a quick change of clothing. He actually accomplished the robbery and stole approximately $90. The evidence permits no rational interpretation other than first degree murder committed in the perpetration of robbery and burglary. Defendant produced no evidence to the contrary.

■ As for the law, defendant concedes that a second degree murder instruction is not required where the evidence presented would not support a theory of second degree murder. (*People* v. *Fitzgerald,* 56 Cal.2d 855, 859-860 [1] [17 Cal.Rptr. 129, 366 P.2d 481]; *People* v. *Turville,* 51 Cal.2d 620, 632 [6] [335 P.2d 678]; *People* v. *Williams,* 174 Cal.App. 2d 364, 386 [345 P.2d 47].) He argues, however, that such a rule penalizes him for choosing not to take the stand, saying that *if* he had testified he *might* have denied entering the store with the intent to rob Mrs. McGraw and that he should not be deprived of the benefit of this missing testimony simply because he exercised his right not to testify. Such an argument is clearly without merit and defendant cites no authority for it.

Third, *that the district attorney's misstatements to the jury were prejudicial.*

There is no merit to this contention. No objection was made at the trial, and no admonition requested. ██ As stated in *People* v. *Mitchell,* 63 Cal.2d 805, 809 [2] [48 Cal.Rptr. 371, 409 P.2d 211], "Misconduct in argument may not be assigned on appeal if it was not assigned at the trial, unless the misconduct contributed to the verdict or was so unredeemable that nothing whatever would have cured it. [Citations.]"

In *People* v. *Asta,* 251 Cal.App.2d 64, 86-87 [16] [59 Cal. Rptr. 206], the court stated: "It is well settled, requiring no citation of authority, that misconduct of a prosecutor in a criminal trial may consist of improper remarks in the opening statement, improper examination or cross-examination, or improper argument. However, the term 'misconduct' implies a dishonest act or an attempt to persuade the court or jury, by use of deceptive or reprehensible methods [citations] . . . Moreover, with two exceptions, the burden is on the defendant who claims that the prosecutor was guilty of misconduct to object and to seek a curative admonition. Hence, if he is silent or merely objects or makes the assignment of misconduct but does not request an admonition, he cannot complain on appeal (Witkin, Cal. Criminal Procedure (1963) § 748, p. 722)."

██ The conduct complained of by defendant here was not misconduct, for "misconduct," as indicated above, implies a dishonest act or an attempt by an attorney to persuade the court or jury by the use of deceptive or reprehensible methods.

The ultimate question which must be answered is whether the conduct of the district attorney was prejudicial, that is, after a review of the entire cause, is it reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. (*People* v. *Watson,* 46 Cal.2d 818, 835 [12] [299 P.2d 243]; *People* v. *Brajevich,* 174 Cal. App.2d 438, 447 [15] [344 P.2d 815].) A review of the record in this case demonstrates that the errors complained of did not constitute such prejudicial error as to demand a reversal.

██ Defendant complains that on three occasions the district attorney stated that Francesca Lee testified that she saw defendant "running out of the Bottle Shop with a hammer in his hand," and that this was a misstatement of the evidence, in that the witness testified not that she saw defendant coming out of the bottle shop but that he was coming from that

direction. Defendant did not object to the statements at the time they were made, and furthermore, Francesca Lee's testimony was thoroughly examined by defense counsel in his argument to the jury. The essential point of her testimony was that Francesca saw a man directly in front of the bottle shop, coming from the direction of the door of the bottle shop, and that she identified defendant as that person. It does not appear that the prosecutor intentionally attempted to mislead the jury when he said that the evidence showed that defendant was running out, rather than coming from the direction, of the liquor store.

Defendant next asserts that the district attorney erroneously argued that the victim's hair was found on a shirt retrieved by the police near the golf course. Human hair that could not be distinguished from defendant's hair was found on the shirt. Other clothing found at the same time and place bore human hair that could not be distinguished from the victim's hair. The comments of the district attorney concerning these items of evidence is an accurate description of the evidence, and his comment that there was more of the victim's hair on the trousers than on the shirt, when the criminalist had not testified that any of the hair found on the shirt was that of the victim, was insignificant and was not made to mislead the jury.

Defendant's next allegation of misconduct is that the district attorney erroneously stated in his argument that "we found blood on every article, which is discovered out there, on every article but for the sack." It is clear from the record that there was no blood on the socks, although there was blood on every other article found, including the sack. However, the significance, if any, of this error is not pointed out by defendant, and it does not amount to misconduct.

Defendant's next contention, that the district attorney was in error in telling the jury that the clothing discovered near the golf course was in fact the clothing of defendant, falls within the realm of proper comment on the evidence. " 'It is the province of a district attorney to state to a jury the various conclusions that he draws from the evidence, and to make it clear to the jury what conclusions in his opinion should be drawn from the evidence introduced, so long as he keeps within the scope of conclusions which may properly be drawn.' (*People* v. *McKenzie*, 12 Cal. App.2d. 614, 615-616 [55 P.2d 1200].). .'The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his

views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury.' (*People* v. *Sieber*, 201 Cal. 341, 355-356 [257 P. 64].)

In the argument before the jury, any reasonable inference may be drawn from the evidence, and it is a matter within the discretion of the trial court to determine whether counsel stays within the permissible range of discussion.'' (*People* v. *Eggers*, 30 Cal.2d 676, 693 [185 P.2d 1].)

The deduction that the clothes recovered by the police near the golf course and introduced into evidence belonged to defendant is a reasonable deduction from the evidence, and the argument of the district attorney in this regard was proper.

Defendant's final contention relates to the district attorney's argument that the victim had type O blood. So far as the record shows, a blood sample was not actually taken from the victim's body. However, blood-soaked clothing was removed from the victim by a representative of the coroner's office, and the blood on this clothing was determined to be human blood, type O. There is no evidence in the record of blood from any other source being on the victim's clothing. Therefore, the comment of the district attorney in this regard was a proper deduction from the evidence presented. Moreover, if the district attorney was of the opinion that the record supported the conclusion that the victim had type O blood, defense counsel expressed the same conclusion in his argument, saying: ''The blood samples throughout indicated pretty much that it was Type O blood. We know that the deceased lady had Type O blood, and we know that the defendant has Type O blood, and we know that 43 percent of us have Type O blood. Is this an explanation for the blood in the car? . . .'' Defendant's allegation of error in this regard has no merit.

Fourth, *that the police lineup resulted in a denial of due process.*

There is no merit to this contention. Defendant contends that the photograph of the lineup shows that the four other men ''have new shirts, have dark pants, and are wearing white T-shirts. On the other hand appellant's pants are very light in color and obviously well worn-out, his shirt is much lighter in color than those worn by the other four men, and he is not wearing a T-shirt.''

Counsel stipulated that the lineup at which Francesca Lee

and Mr. Shuman identified defendant was held on March 21, 1967, nine days after the murder, and the officer conducting the lineup was not called to testify. We have examined the photograph of the lineup and find no merit in defendant's contention that it unfairly focused attention on defendant. All five men are on crutches, each wearing but one shoe, on his left foot; on the right foot, each man has a white sock. All five men are clad in collared shirts, unbuttoned at the throat. The shirts on two men are long-sleeved, rolled up at the wrist; the other three shirts are short-sleeved. The facts that defendant is the only one whose undershirt is not visible at the throat and that his pants appear lighter in color do not result in such unfairness as to deny him due process of law. (*Stovall* v. *Denno,* 388 U.S. 293, 296 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967]; *People* v. *Feggans,* 67 Cal.2d 444, 448-449 [3] [62 Cal.Rptr. 419, 432 P.2d 21].)

▋ Fifth, *that he was deprived of his constitutional right to an impartial jury.*

Although defendant is represented by court-appointed counsel on appeal, he filed a supplemental brief in propria persona, encompassing almost all of Mr. Justice Douglas' concurring opinion in *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. He argues that the exclusion of three veniremen, who were properly excused under *Witherspoon* standards for their opposition to the death penalty,[4]

---

[4]The prospective jurors excused had raised their hands when the trial court had asked whether they had any conscientious scruples that would preclude them from either "making a finding of guilt" or "of exercising discretion as to punishment in imposing the death penalty." They were thereafter examined at length. The first prospective juror excused was questioned: "THE COURT: Did you indicate earlier that you have some conscientious objection against the death penalty law? MRS. RAMIREZ: Yes, sir. I do. THE COURT: You are firmly convinced in your own mind of your attitude? MRS. RAMIREZ: Yes. THE COURT: And is that such that it would preclude you from bringing in a death penalty in the event that were the proper verdict—or a proper decision in the case? MRS. RAMIREZ: Yes, sir. THE COURT: You could not do it, in other words? MRS. RAMIREZ: No, I couldn't. . . . MR. SALAMY [defense counsel]: Mrs. Ramirez, you have indicated that you are against the death penalty, is that it? MRS. RAMIREZ: Yes, sir. MR. SALAMY: Well, now, you understand that it is the law of this State that this type of case we are talking about now has a possible death penalty? MRS. RAMIREZ: Yes, sir. MR. SALAMY: The other possibility is a life sentence. Do you understand that? MRS. RAMIREZ: Yes. MR. SALAMY: And since that is the law of this State, the jury that sits on this case must be willing to follow the law of this State which is making a rational choice after hearing all of the evidence. Do you appreciate that? MRS. RAMIREZ: Yes, sir. MR. SALAMY: And that a rational choice may be one or the other, depending upon the attitude of that particular juror? MRS. RAMIREZ: Yes. MR. SALAMY: Now, do you think that your state of mind is such that you could in no case vote the death penalty no matter

denied him the right to an impartial jury to determine his guilt. He cites an 1857 case, *People* v. *Stewart,* 7 Cal. 140, where it was held that the defendant was prejudiced when one venireman, who opposed the death penalty in principle, was erroneously excused as incompetent. Reliance on the

how culpable or how bad you felt it was? MRS. RAMIREZ: That's right. MR. SALAMY: So, your position is that there is no case, no matter how varied your imagination is, in which you could impose the death penalty? MRS. RAMIREZ: I am afraid not. It has been my belief all my life, and it is too late to change. I just couldn't do it. MR. SALAMY: Even though it is the law of the State of California that a choice can be made in the proper case. MRS. RAMIREZ: That's right.''

The second prospective juror excused was questioned: ''THE COURT: [You] indicated you had some attitude on the death penalty? MRS. WARNER: That's right. THE COURT: What is your attitude on that? MRS. WARNER: Well, it would be very difficult for me to return a death verdict. THE COURT: Would you find it impossible if it were a proper case? MRS. WARNER: Yes, I think I would. THE COURT: In other words, you have some conscientious attitude that would preclude you from, in a proper case, bringing in a death penalty? MRS. WARNER: Yes, sir. . . . MR. PUGLIA [prosecutor]: No matter what the case or what the evidence, I take it, Mrs. Warner, from your stated opinion you would not be able to assess the death penalty? MRS. WARNER: Yes. . . . MR. SALAMY [defense counsel]: Well, Mrs. Warner, your first remarks when you sat down were that you don't feel—or you would find it very difficult to be able to impose the death penalty. Is that what your remark was? MRS. WARNER: That's right. MR. SALAMY: That suggests to me that you could, although you would find it difficult. Is that your state of mind? MRS. WARNER: No, I will reword that. I would find it impossible to return that verdict. MR. SALAMY: Well, now, you understand that the only lawful reason why you could not sit is that if you could in no case, even one that you considered proper, impose the death penalty? MRS. WARNER: That's right. MR. SALAMY: Well, may I inquire as to whether that feeling of yourself is one of long standing——. MRS. WARNER: Yes, it is. MR. SALAMY: Or did you just think about it today? MRS. WARNER: No. It is of long standing. MR. SALAMY: May I infer from your remarks, then, that you have considered it several times? MRS. WARNER: Yes, I have.''

The third prospective juror excused was questioned: ''THE COURT: When the questions were being asked, I think you raised your hand in the audience signifying some attitude on the imposition of the death penalty as a matter of conscience? MR. FLETCHER: Yes, sir. THE COURT: Is that attitude that you could not, in a proper case, bring in the death penalty? MR. FLETCHER: That's right, sir. . . . MR. PUGLIA [prosecutor]: Mr. Fletcher, again is that a feeling which would preclude you from—in any case, despite the evidence and despite the circumstances, as a matter of conscience, from imposing the death penalty as a juror? MR. FLETCHER: That's right. Any case. MR. PUGLIA: Just across the board? MR. FLETCHER: Yes. . . . MR. SALAMY [defense counsel]: Mr. Fletcher, have you considered this question prior to thinking about it this morning? MR. FLETCHER: No, sir. It is something I have felt for a long time. MR. SALAMY: Well, have you considered the possibility of—of whether or not you would—you would be able to employ the death penalty in a certain type—of a particular serious case? MR. FLETCHER: No time. MR. SALAMY: You don't feel you could at any time? MR. FLETCHER: No, sir. MR. SALAMY: No matter—no matter how serious the case, no matter if it would protect some innocent person later on? MR. FLETCHER: No time at all. I don't believe in the penalty.''

*Stewart* case was fully explored and rejected in *People* v. *Ray,* 252 Cal.App.2d 932, 950 et seq. [2d] [61 Cal.Rptr. 1] [hearing denied by the Supreme Court], where the court noted that the *Stewart* case had been criticised in *People* v. *Murphy* (1872) 45 Cal. 137. Subsequent statutory changes in the methods of challenging jurors for cause have rendered the *Stewart* case of no force.

The contention that a jury from which veniremen irrevocably opposed to the death penalty have been excluded ''cannot answer guilt-innocence questions as favorably to the defendant'' was rejected in *People* v. *Nicolaus,* 65 Cal.2d 866, 882 [15] [56 Cal.Rptr. 635, 423 P.2d 787]. (See also *Bumper* v. *North Carolina,* 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788].) There is no merit to defendant's contention that his guilt was determined by a partial and biased jury.

The judgment is affirmed in its entirety.

Traynor, C. J., Mosk, J., Burke, J., and Sullivan, J., concurred.

PETERS, J.—I agree that the judgments must be affirmed in this case for the reasons stated, but my reason for this concurrence should be clearly stated. Inevitably, involved in this and all other death penalty cases in California is the issue of the constitutionality of the procedures used in this state in imposing the death penalty. This issue was argued at length in *In re Anderson* and *Saterfield,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]. There this court, by a four to three majority, held that the death penalty procedures adopted in California were constitutional. I disagree with that conclusion, and in the instant case would hold the death penalty procedure adopted in California is unconstitutional, for the many reasons so forcibly expressed by Mr. Justice Tobriner in his dissent in the *Anderson* and *Saterfield* case. But unless or until at least four members of this court rule to the contrary, or unless or until the United States Supreme Court overrules the majority of this court, I am bound by the majority rule announced in that case. Solely under compulsion of the majority rule adopted in that case it must be held in the instant case that the death penalty in California is constitutional.

Traynor, C. J., and Tobriner, J., concurred.