[No. B043465. Second Dist., Div. Four. June 14, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY LEWIS ARMIJO, Defendant and Appellant.

**COUNSEL**

Thomas F. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Marc E. Turchin and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GOERTZEN, J.**—After a jury trial, defendant/appellant Anthony Lewis Armijo (appellant) was found guilty of burglary in the first degree. (Pen. Code, § 459.) Appellant appeals, asserting there is no substantial evidence to support his conviction because the witnesses' extrajudicial identification was not confirmed at trial and there was no other evidence tending to connect him with the crime; prejudicial instructional error occurred; and the court prejudicially erred when it allowed the prosecutor to ask witnesses if they had been threatened. For the reasons discussed below, we reject each of these contentions and affirm.

FACTS

*The People's Case.* Around 9 p.m. on January 19, 1989, Jose Martinez and his wife left their home, located at 1431 West Arlington Street in Long Beach, to go to the laundromat. Before leaving the house, Mr. Martinez locked it and gave no one permission to enter.

When Mr. Martinez and his wife returned about 45 minutes later, police officers were outside of his house along with some "kids that lived next door" to Mr. Martinez. One of the youths present was known to Mr. Martinez as David. Upon entering and checking the house, Mr. Martinez discovered that a video recorder, stereo components, wedding bands, watches, a camera, and other miscellaneous items were missing.

Around 9:40 p.m. on January 19, 1989, Officer David R. Daniels of the Long Beach Police Department arrived at the Martinez home in response to a report of a burglary. He and his partner were dressed in uniform and were driving in a black and white police car. Upon exiting the police car, the officers immediately were approached by three youths: David Delorbe, Rudy Manquero, and Jennifer Ovalle.

David spoke first. He told Officer Daniels that he lived next door to the Martinez home. Earlier in the evening he, the other two youths, and appellant had been standing on the northeast corner of Arlington and Denver when a neighbor had asked David to keep an eye on the neighbor's house. After David conversed a bit with appellant, David, Rudy, and Jennifer went to Jennifer's house, across the street from David's home. While standing on the porch, David saw appellant remove a screen from a window of the Martinez house. Not wanting to be seen by appellant, the three youths moved to a better location where they could observe appellant and not be seen. From the second location, David noticed that the screen was off and the window was open, but he could not see appellant. After a few moments, David saw appellant exit the back door of the north side of the Martinez home. Appellant carried two white pillowcases, filled with something. David related to Officer Daniels that he knew appellant as "Humpty" and described appellant as "male black [*sic*], approximately 28 years, 5' 7", stocky build, thick mustache with tattoos upon his body." David also informed Officer Daniels that after appellant left the Martinez home, appellant went westbound on 34th, southbound on Caspian, then eastbound on 33rd Street.

Next, Officer Daniels spoke to Rudy Manquero. Rudy told Officer Daniels that he knew where appellant lived because he knew appellant's sister. Rudy further related that that evening around 9 p.m. he was with David

Delorbe and Jennifer Ovalle. After conversing with appellant, the three went over to Jennifer's front porch and observed appellant walk over to the Martinez house and remove the screen from a window. The three then moved to a location where appellant could not see them. When they arrived there, Rudy could not see appellant but did notice the screen was off the window and the window was open. He then saw appellant leave the back door on the north side of the Martinez house with two full pillowcases.

Lastly, Officer Daniels spoke to Jennifer Ovalle. She related that she was with David and Rudy and saw appellant remove the screen from the Martinez home. The three moved to another location where they could watch appellant without being seen by him. Appellant came out the back door on the north side of the Martinez house with two white pillowcases. Jennifer also told Office Daniels that she, David and Rudy followed appellant westbound on 34th, southbound on Caspian, and eastbound on 33rd Street.

While interviewing the three youths, Officer Daniels separated the one being interviewed from the remaining two by about fifteen feet.

After completing the interviews, David and Rudy accompanied Officer Daniels to appellant's house, to which they were directed by Rudy.

About one week later, on January 26, 1989, Detective Dennis Maloney, who was assigned to the burglary detail, went to appellant's house. When appellant's mother answered the door, Detective Maloney identified himself as a police officer and informed her that he wished to speak to appellant. Appellant's mother explained that appellant was asleep but that she would awaken him and bring him to the door. She left to awaken appellant, and five minutes later shouted, "He's trying to get out the back." Detective Maloney went to the back of the residence and, upon seeing appellant, arrested him for residential burglary.

At trial, David Delorbe testified that he is 16 years of age; that on January 19, 1989, around 9 p.m. he was not in the vicinity of the burglary; he was not with Jennifer and Rudy at 9 p.m., and only talked to Jennifer around 11 p.m. when she returned a cassette; that around 9:40 p.m. that night he did not speak to a police officer; he did not tell the officer that earlier that evening he had been standing on the corner with Jennifer, Rudy and appellant. He testified that he did not tell the officer that he knew appellant as "Humpty"; he only knew appellant because he had seen him around the neighborhood; he knew appellant had a brother and had not spoken to the brother, nor had the brother threatened him since the time of

appellant's arrest.[1] He said that he did not describe appellant to Officer Daniels as a "male Mexican, 28, 5' 7", stocky build with black hair, numerous tattoos with a mustache"; he did not tell Officer Daniels that he, Rudy and Jennifer had been in Jennifer's front yard and observed appellant walk over to the Martinez house and remove the screen from the window, moved to a second location where appellant could not see them and where they saw the screen was removed and the window open, and three or four minutes later saw appellant leave from the back door with two full pillowcases. He said he did not tell Officer Daniels that he saw appellant go southbound on Denver and followed him to westbound on 34th street. He said he did not accompany Officer Daniels anywhere that night.

At trial, Rudy Manquero testified that he is 16 years old; that on January 19, 1989, he visited David; around 9 p.m. he, David and Jennifer Ovalle were outside in Jennifer's yard; he did not speak to a police officer that night; yes, he did speak to an officer when he came out of David's house and the officer asked him if he had seen anything; he knows appellant and had seen appellant earlier that evening outside the house but did not see where appellant went after talking to him and did not see appellant later that night; that when Mr. Martinez returned, Rudy was in Jennifer's yard across the street; he had not seen what had happened at the Martinez house; he saw David speak to Officer Daniels but did not hear what David said; he did not speak to Officer Daniels about what happened and did not know the Martinez house had been burglarized until after the police arrived. Rudy said that he did not tell Officer Daniels he saw who had burglarized the Martinez house and does not know; he did not recall telling Officer Daniels about "Humpty," but did tell Officer Daniels where "Humpty's" sister lived. He testified that he and David accompanied Officer Daniels to appellant's house, to which he had directed the police, but he did not tell the officer that was where "Humpty" lived. He said he saw appellant's brother at the preliminary hearing, but the brother did not speak to him and did not threaten him.

---

[1] Appellant's counsel objected to the prosecutor questioning David about any threats by appellant's brother. The court overruled the objection, commenting, ". . . the basic fact if it's true if these witnesses [sic] have [sic] said these things to the police officer and is now testifying the way he is right now also with the addition of what the court observes about his behavior and demeanor of the way he's looking down and looking around, the way he's acting as a witness, it's pretty obvious there's likely to be a good reason for somebody having this lapse of memory, which seems to the court he is having. And there's [sic] always so many explanations for that kind of thing. [¶] You're entitled, in my view, to ask a question to see if there is some reason to see, yes, somebody is backing down without somebody having seen or observed or having evidence of a direct threat. Frequently those threats are not something that can be developed, but there's also such a thing as common sense and life's experiences telling you what makes people change their mind and back down."

While the court refused the defense request that it admonish the prosecutor not to ask any questions about threats being made by appellant's brother, it did instruct the jury that questions are not evidence.

At trial, Jennifer Ovalle testified that she is 15 years old and lives across the street from David Delorbe; that David and Rudy are her friends, and on the 19th of January, she did not see them around 9 p.m.; that she did see Rudy around 10:30 p.m. She said that earlier, around 7:30 or 8 p.m., Rudy and David were at her house on the front porch; that she had seen appellant around but did not know his name; that on the 19th of January, she did not see appellant after 8 p.m., did not see Rudy and David on the corner in the evening, and did not see the police arrive. She said she did not speak to an officer that night; she did not tell Officer Daniels that she, Rudy and David were in her yard that night and had seen a person at the house across the street, that she had seen appellant by the house, had seen him remove a screen from a window, and had seen him leave through the back door carrying two full pillowcases. She did not hear Rudy or David tell the foregoing to the police. She met appellant's brother at the preliminary hearing, but he did not threaten her at that time or ever.

*The Defense Case.* There was no defense presented.

## PROCEDURAL HISTORY

By information, appellant was charged with residential burglary with the further allegation that he had previously been convicted of two counts of attempted residential burglary. At his arraignment, appellant pleaded not guilty and denied the priors. Appellant subsequently waived trial by jury as to the priors.

After the prosecution and defense rested, appellant unsuccessfully moved for acquittal, arguing there was insufficient evidence to sustain a conviction. (Pen. Code, § 1118.1.)

After trial, appellant was found guilty of first degree residential burglary, and the court found the priors to be true. Appellant was sentenced to state prison for the high term of six years as the base term, plus five years for the priors, for a total of eleven years. He was also ordered to pay $100 restitution and was given 165 days credit for time served and 55 days good time/work time.

## DISCUSSION

*Corroboration of Out-of-court Identification.* In *People* v. *Gould* (1960) 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865], the facts showed that about an hour after confronting the two defendants while they burgled her apartment, the victim identified them from a group of photographs and did so again on subsequent occasions. Defendant Gould made incriminating

statements to police regarding involvement in the burglary; defendant Marudas denied any involvement whatsoever. At trial, the victim had difficulty identifying Gould and could not identify Marudas at all. The Supreme Court found there was sufficient corroboration to sustain Gould's conviction. As to Marudas, however, the court held that while a prior out-of-court identification by a testifying witness could be admitted and considered for the truth of the statement itself, and not simply to impeach or corroborate the in-court testimony, such an extrajudicial identification, which cannot be confirmed at trial is insufficient to sustain a criminal conviction "in the absence of other evidence tending to connect the defendant with the crime. [Citation.] Moreover, the probative value of an identification depends on the circumstances under which it was made." (*Id.*, at p. 631.)

■ Citing *Gould* and its progeny, appellant asserts substantial evidence is lacking to sustain his conviction because there is an absence of other evidence tending to connect him with the Martinez burglary and the extrajudicial identification made by David, Rudy and Jennifer was not confirmed at trial or at the preliminary hearing.

This argument fails for the simple reason that there was indeed evidence at trial which tended to connect defendant with the crime. Appellant forgets that the out-of-court statements of each of the witnesses are admissible as competent evidence and may be considered for the truth of the statements themselves. (*People* v. *Gould*, *supra*, 54 Cal.2d at p. 631.) For each of the youth's out-of-court statements there were two statements, admitted into evidence, made by the other two youths which were substantively identical and clearly connected appellant to the commission of the crime. The requirements of *Gould* are satisfied.

In addition, the primary concern of *Gould* and its progeny was with the circumstances under which the prior identification was made. (*People* v. *Gould*, *supra*, 54 Cal.2d at p. 631; *People* v. *Chavez* (1980) 26 Cal.3d 334, 363 [161 Cal.Rptr. 762, 605 P.2d 401]; *People* v. *Ford* (1981) 30 Cal.3d 209, 215 [178 Cal.Rptr. 196, 635 P.2d 1176].) The pivotal question is: Do the circumstances, under which the witnesses' statements to Officer Daniels were made, provide a level of reliability such to insure their accuracy and trustworthiness? Each of the aforementioned cases discussed the need for indicia of reliability.

Here, the facts include the following indicia of reliability in the circumstances surrounding the three witnesses' out-of-court statements: (1) David, Rudy and Jennifer were not accomplices; consequently, their statements need not be viewed with " 'care, caution and suspicion because [they come] from a tainted source,' " and might be "influenced by the self-serving

motives" of an accomplice (*In re Miguel L.* (1982) 32 Cal.3d 100, 108 [185 Cal.Rptr. 120, 649 P.2d 703]); (2) the officers arrived at the Martinez home almost immediately after the burglary occurred; (3) the three witnesses voluntarily approached the officers immediately upon the officers' arrival; (4) there is no evidence that any of the three witnesses suffered from any physical or mental impairment when the statements were made; (5) each of the three statements completely corroborated the others; (6) as each of the witnesses spoke to Officer Daniels he or she was separated from the other two by about fifteen feet; (7) all three witnesses knew appellant as they had seen him around the neighborhood; (8) David described appellant in detail, including his weight, height, mustache, and the tattoos on his body; (9) Rudy admitted in his trial testimony that he and David accompanied Officer Daniels to appellant's home; and (10) the address to which Rudy and David took Officer Daniels, in fact, was where Detective Maloney later arrested appellant. We hold that these facts provide sufficient indicia of trustworthiness not found in *Gould*, *Chavez*, or *Ford*.

Both *Chavez* and *Ford* also discussed the other evidence presented to the jury which provided a basis for crediting the witness's prior identification over his or her trial testimony. (*People* v. *Chavez, supra,* 26 Cal.3d at p. 364; *People* v. *Ford, supra*, 30 Cal.3d at p. 214.) The record indicates that such evidence was also presented in the instant case.

We grant that when the prosecutor asked each witness if he or she had been threatened by appellant's brother, each answered in the negative. We also note, however, that when appellant's counsel objected and a discussion ensued at the sidebar, the court specifically commented on the demeanor of the witness. (See fn. 1, *ante.*) The court observed that the witness (David) was "looking down and looking around, the way he's acting as a witness, it's pretty obvious there's likely to be a good reason for somebody having this lapse of memory, which . . . he is having." If it was this obvious to the court that some reason existed to prompt the change in the witnesses' stories, it certainly was equally obvious to the jury. We have long recognized that a jury may base a decision on many types of evidence, including the demeanor of a witness. The importance of a witness's demeanor is one of the bases for the rule on appeal disallowing our reweighing of the evidence—the trial transcript gives no hint of the timbre of a witness's voice, the focus of a witness's eyes, the overall body language which can speak volumes to the trier of fact. Here, the demeanor of the witnesses coupled with the inconsistency of their trial testimonies, one to the other, provided the jury with sufficient evidence, causing it to believe the extrajudicial statements over the trial testimony.

*Instructional Error.* ■ Appellant asserts that the court prejudicially erred when it refused to charge the jury with his proffered special

instruction, which read: "You may not convict the defendant on the basis of an out-of-court statement unless you find that the statement is corroborated by other evidence which tends to connect the defendant with the commission of the offense." The court refused to so instruct the jury because it found the instruction inapplicable and feared it would mislead the jury. Instead, it charged the jury as follows: "You may not convict the defendant on the basis of an out-of-court statement unless you find that at the time the statement was made it was done under such circumstances as to indicate its reliability."

Given our conclusion that there was solid in-court testimony confirming the out-of-court statements and connecting appellant with the crime, we conclude that the court's refusal to give the pinpointed *"Gould"* instruction, if erroneous, was harmless. The court properly focused the jury on the circumstances which indicate the reliability of the extrajudicial statements.

*Questions Regarding Threats.* ■ Finally, appellant contends that the court prejudicially erred when it allowed the prosecutor to question each of the teenage witnesses about any threat they may have received from appellant's brother. Appellant objected when this question was asked of David. In addition to the court's comments quoted, *ante,* in footnote 1, the court also responded: "From the information I have, the witness gave statements implicating the defendant before. Now he's saying not only is that not true, . . . , but he didn't even talk to the officer. And then it seems to me appropriate for the trier of fact to give sufficient information for them to assess and digest what reason there is for a witness to change his testimony, recant his testimony, testify the way he is right now. [¶] The question really is a balancing of how much we should allow, depending upon what it is that is being proffered by the People and how much we should not allow in fairness to both sides in this case."

It was readily apparent to the trial judge that the witnesses were reluctant, and the reason for their hesitancy to testify was highly relevant to the case at hand. (See *People* v. *Frausto* (1982) 135 Cal.App.3d 129, 140-141 [185 Cal.Rptr. 314].) It was clearly within the court's discretion to allow the question if its potential probative value outweighed it prejudicial impact. (Evid. Code, § 352.)

In any event, the questions elicited negative responses, and the jury was admonished immediately thereafter that the attorney's questions were not evidence. Moreover, we note that during cross-examination, defense counsel repeated the question to David and asked him if anybody had made any threats to him in regards to this case. David replied, "No, Sir."

Appellant objects, arguing that the question by the prosecutor was not asked in good faith. The record does not support this contention. Prosecutorial misconduct implies a dishonest act or an attempt by an attorney to persuade the court or jury by use of deceptive or reprehensible means. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) Here, the prosecutor informed the court that at the preliminary hearing appellant's brother threatened the teenage witnesses. This representation is supported by the preliminary hearing transcript. It reveals that at the preliminary hearing, the court noted the presence of "a rather large gentleman seated in the audience glaring at all three witnesses. . . . He was rather intimidating in his demeanor. As each witness filed into the courtroom, they looked in his direction before taking the stand. He continued to glare at them the entire time they were testifying. [¶] In fact, I will also note that one of the other officers that is present in the court today happened to note the same thing I did and moved closer to this gentleman, as he felt his demeanor was threatening, as well." The question was asked in good faith.

DISPOSITION

The judgment is affirmed.

George, Acting P. J., and Todd, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied September 20, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

* Assigned by the Chairperson of the Judicial Council.