[Crim. No. 12401. First Dist., Div. Two. May 8, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN VALLEJO CORONA, Defendant and Appellant.

[Crim. No. 15257. First Dist., Div. Two. May 8, 1978.]

In re JUAN VALLEJO CORONA on Habeas Corpus.

## COUNSEL

Michael A. Mendelson and Louis Garcia, under appointments by the Court of Appeal, Exelrod & Mendelson, Alan B. Exelrod, Brian B. Beckwith, Mario Obledo, Stephen Adams, Paul H. Alvarado and George T. Davis for Defendant and Appellant and for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey, Marjory Winston Parker, Paul H. Dobson, Kevin M. Corrington and Gregory W. Baugher, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KANE, J.—This is a petition for habeas corpus and an appeal from a judgment of conviction entered on jury verdicts finding petitioner and defendant Juan Vallejo Corona (hereafter appellant or Corona) guilty of 25 counts of first degree murder.[1]

The prosecution and conviction at bench grew out of the killing of 25 migratory farmworkers who died during a time frame of February-May, 1971. The gravesites and bodies were discovered on the Kagehiro and Sullivan ranches in the Marysville-Yuba City area of Sutter County, between May 20 and June 4, 1971. Although with the exception of Kenneth Whitacre, whose remains were uncovered first, the exact dates of the demise of the victims could not be determined, the evidence

[1]The counts charged and found true by the jury are as follows: Count I: The murder of Kenneth Whitacre on or about May 19, 1971; count II: The murder of Charles Fleming on or about May 8 to May 11, 1971; count III: The murder of Melford Sample on or about May 21, 1971; count IV: The murder of an unidentified male adult on or about February 25, 1971, to about May 11, 1971; count V: The murder of Donald Smith on or about April 30 to May 11, 1971; count VI: The murder of John J. Haluka on or about February 25 to May 11, 1971; count VII: The murder of an unidentified male adult on or about February 25 to May 11, 1971; count VIII: The murder of Warren Kelley on or about March 30 to May 11, 1971; count IX: The murder of Segurd E. "Pete" Beierman on or about February 25 to May 11, 1971; count X: The murder of an unidentified male adult on or about February 26 to May 12, 1971; count XI: The murder of William Emery Kamp on or about February 26 to May 12, 1971; count XII: The murder of an unidentified male adult on or about February 26 to May 12, 1971; count XIII: The murder of Clarence Hocking on or about February 26 to May 12, 1971; count XIV: The murder of James W. Howard on or about May 1 to May 13, 1971; count XV: The murder of Jona R. Smallwood on or about May 12, 1971; count XVI: The murder of Elbert J. T. Riley on or about May 12, 1971; count XVII: The murder of Paul B. Allen on or about May 2 to May 13, 1971; count XVIII: The murder of Edward Martin Cupp on or about May 9 to May 13, 1971; count XIX: The murder of Albert Hayes on or about February 27 to May 13, 1971; count XX: The murder of Raymond Muchache on or about May 12, 1971; count XXI: The murder of John H. Jackson on or about April 15 to May 14, 1971; count XXII: The murder of Lloyd Wallace Wenzel on or about May 14 to May 22, 1971; count XXIII: The murder of Mark Beverly Shields on or about April 28 to May 15, 1971; count XXIV: The murder of Sam Bonafiede, also known as Joe Carriveau, on or about April 21 to May 20, 1971; count XXV: The murder of Joseph Maczak on or about April 26 to May 21, 1971.

introduced at the trial strongly indicated that the pattern of the killings and the modus operandi employed by the perpetrator were strikingly similar. Of all 25 victims, all but one had incurred one or more chop-type or hacking-type injuries to the head. The chop wounds were of two kinds: slashing wounds inflicted probably with a light weapon, such as a knife, and severe chop wounds caused by a heavy instrument such as a bolo machete. The latter wounds typically appeared in a horizontal direction covering the face, head and ear, and were inflicted with a force of such magnitude that they cut the bone and severed the upper and lower parts of the skull. The other common pattern was the infliction of stab wounds in the upper left chest of the victims by using a cutting instrument which penetrated the heart or lung and severed the aorta leading from the heart to the lungs. The common modus operandi was further bolstered by the circumstances that the victims were buried in the same general area, in a manner which was likewise similar, if not identical. Almost without exception, each of the victims was lying on his back with his hands over the head, chest or stomach, and his shirt or other clothes pulled over the head. Moreover, in at least seven graves the underwear of the victims was pulled off or removed, exposing the penis and genital area, giving rise to the inference that the crimes may have been sexually motivated, and that the perpetrator may have been a homosexual. Because of the salient likeness of the injuries inflicted, the instruments used and the mode of burial, there was a consensus on the part of all concerned (including trial counsel for appellant) that all the crimes charged were committed by the same person or persons.

Corona was connected to the crimes by an intricate and elaborate set of circumstantial evidence. To begin with, at all relevant times Corona was employed as a labor contractor by Messrs. Kagehiro and Sullivan for the purpose of hiring and supervising itinerant farmworkers who did seasonal harvesting and thinning jobs in the orchards. As a consequence, Corona had unquestionable access to the area where the gravesites and the bodies of the victims were found. In addition, he was seen by several eyewitnesses in the area of the crimes at crucial times, and was connected to a number of graves by demonstrative evidence as well.

At the outset, it is well to remember that of all the victims only the time of Whitacre's death could be determined with certainty. Mr. Kagehiro testified that at about 10 a.m. on May 19, 1971, he found a hole in the northeast corner of his peach orchard. The hole was about three and one-half to four feet deep, seven feet long, and thirty inches wide. The dirt had been piled up alongside the hole. When later the same day, at or

about 6 p.m., Kagehiro returned to the hole, the dirt had been filled back in. Kagehiro called the police. In response to the call, the following morning, about 9 a.m., the police uncovered the grave and found Whitacre's body. The victim was lying on his back with his right arm extended over his head, and left arm across his chest. His shirt was pulled over his head. The ensuing autopsy revealed that Whitacre had suffered a serious injury in the back of the head which had fractured the underlying skull bone. The wound had been caused by a machete or machete-like instrument. Also, there was a stab wound in his left chest which had been inflicted by a knife or knife-like instrument. The cause of death was the stabbing in the chest which cut the aorta between the left lung and the heart. According to expert testimony, Whitacre had been dead probably less than 24 hours.

Since the murder of the first victim showed the common hallmarks of all the other killings as well, the proof surrounding Whitacre's death and appellant's connection thereto gains special significance. Through a number of eyewitnesses, the prosecution established that Whitacre was last seen in the general area of the Kagehiro farm about 1 p.m. on May 19, 1971. Additional evidence produced by the prosecution revealed that appellant was present at or near gravesite No. 1 at the crucial period of time. Thus, witness Khera, who owned an orchard bordering Kagehiro's property, testified that one or two days before Whitacre's body was found, he saw appellant on his ranch close to the place where the gravesite was located. Corona was driving a "kind of white" van in the late afternoon. Khera stopped appellant and asked him what he was doing there. Corona told Khera he had come to look at the trees to see how much Khera was going to pay for work in the trees. The crew on the Kagehiro property had quit work at 2 or 3 o'clock in the afternoon, and Khera did not think that appellant had any business looking around that late. Khera had seen appellant once before in the same area.

Other eyewitnesses testifying to the presence of Corona at or near the crime scene were Sharon and David Schmidl. On May 19, between 8 and 8:30 p.m. they went to the Sullivan ranch to fish in the river. David walked over to the river while Sharon remained in their pickup. Although it was getting dark, they observed a red and white pickup parked nearby which bore the inscription " 'Juan V. Corona, Labor Contractor' " on the side. There was no one in the pickup. While Sharon was waiting for her husband, appellant was seen coming out of the brush, getting into his vehicle and leaving in a hurry.

Demonstrative evidence in the form of a plaster cast taken from the tire impressions found at Whitacre's grave showed that the tracks were made by the same kind of tires that were on Corona's van.

Appellant's connection with the killings became even more apparent when gravesite No. 3 was discovered. The body of the third victim, Melford Sample, disclosed the same type of wounds as Whitacre's: hacking in the back of the head and stab wounds in the left chest. More significantly, however, about six to eight inches above the feet of the victim two pieces of pink paper were found. They were slips from the Del Pero Meat Company, dated May 21, 1971, and bore the name of Juan Corona. The two meat slips were folded together, and one of them was signed " 'Juan V. Corona.' " Mr. Frazier, a meat cutter at Del Pero Brothers Meat Market in Yuba City, testified that he sold meat to appellant on May 21, 1971; that appellant did not pay for the purchases but signed the sales slips as a charge; that he gave the slips to appellant who folded them and put them in his right shirt pocket; and the meat slips found in the third grave were identical to the sales slips given to Corona.

To dispel any possible remaining doubt, in the 25th grave, the burial ground of Joseph Maczak, the police discovered a number of sundry items (candleholder, pieces of broken mirror, child's sock) belonging to Corona (see discussion below), and more importantly two Bank of America deposit slips. Printed on the slips was "Juan V. Corona, 768 Richland Road, Yuba City, California."

In view of the incriminating evidence found in the graves and gathered from various other sources, on May 26, 1971, appellant was arrested. Thereafter, pursuant to search warrants duly executed by a magistrate, appellant's office facility (which was part of the mess hall) on the Sullivan ranch and his home were searched by the officers.

The search of the office facility yielded the following evidence:

In the kitchen there was a glass candleholder sitting in the sink. It was eight or ten inches tall, and about two or three inches in diameter. The candleholder was made of red, green and yellow colored glass, and there was writing on it in Spanish. The broken pieces of the glass candleholder found in the 25th grave bore great similarity to the candleholder seized in the mess-hall. The colors, the design and the Spanish inscription of the

broken glass all indicated unquestionable resemblance to the candlehold-er found during the search of the mess-hall.

In the corner of the mess-hall was a locked metal desk. In the lower left-hand drawer was a nine millimeter Browning automatic pistol in a case. The gun, which had been purchased by Corona in 1967, was loaded, cocked and had one round in the chamber and three in the clip; and the safety was off. The searching officer removed the clip and ejected the shell from the chamber. It is worthy to note that the 11th victim, William Kamp, was shot in the head with a pistol. Chemical analysis of the bullet in the head of that victim indicated that it had been manufactured by Remington; that it could have come from the same batch of bullets that were found in appellant's desk; and that it matched bullets fired from Corona's gun in several respects.

In the drawer with the gun was a long knife with a silver and black laminated handle. The knife was in a sheath. On one side of the knife blade were the words "Tennessee Toothpick." There appeared to be coagulated blood on the knife near the guard.

A hunting knife in a leather sheath was found on the top shelf of some storage shelves along the west wall of the mess-hall kitchen, wrapped in a Spanish magazine. The handle appeared to be laminated leather. The knife was lying between the pages of the magazine, and could not be seen from the floor.

Hanging on a nail in the kitchen were several receipts, including receipts from the Del Pero Brothers Market made out to Juan Corona and signed at the bottom, " 'Juan Corona.' "

A subsequent search of the mess-hall additionally produced a Univer-sal brand V-6 ink pen that wrote in six different colors. As discussed later, the five colors of ink on the so-called "death ledger" matched the colors in appellant's pen.

The search of Corona's house led to the following pieces of evidence:

In the garage attached to the house the police found a post-hole digger leaning against the wall. The blade of the digger was covered with dried mud in which hairs were embedded. There was also a Levi jacket lying on boards laid across the rafters of the garage.

The search of a 1969 Chevrolet Impala automobile (light colored hardtop with a vinyl top, two-door, license No. 878AAQ) parked in the garage produced the following items: In the trunk of the car there were a heavily stained small belt, two throw rugs and two floor mats. Similar to the belt, one of the throw rugs showed stains on it. Bloodstains also appeared on the latch of the trunk of the automobile.

Under the driver's seat of the yellow and white Chevrolet van parked in the driveway, the police found a bolo knife in an imitation leather zipper bag. In addition the bag contained two pairs of soiled men's jockey shorts and nine millimeter shells. In the back of the van there were rubber boots and a shovel. Bloodstains appeared on the boots and all over the inside and outside of the van (on the spare tire, walls and ceiling as well as on the outside bumper and tank).

During the search of the interior of the house, a green ledger was found in a filing cabinet drawer in the master bedroom. Between pages 52 and 53 of the ledger there was a single immigration document with writing on both sides. Pages 50 through 52 of the ledger contained names and dates, and there were names and dates written on the back of the immigration document as well. Furthermore, a receipt from Del Pero Brothers, dated May 11, 1971, and bearing the name of Juan Corona was found in a dresser drawer.

The ensuing laboratory examination of the items seized in the search of the mess-hall, the Corona house and garage revealed human blood of all four blood types.[2]

There were human bloodstains (type O) around the muzzle and inside about an inch underneath the slide of the Browning automatic pistol. The "Tennessee Toothpick" knife found in the desk drawer had human blood (type B) in the area of the hilt. The hunting knife hidden in the Spanish magazine had human blood (type A) in the area of the guard, in a grooved area on the back of the handle, and along the cutting edge of the blade. The Levi jacket retrieved from the garage contained human bloodstains (group B) near the right shoulder. In the trunk of the Chevrolet Impala there were human bloodstains on the rubber molding near the latch on the trunk lid and on the latch itself, and there was a considerable quantity of human blood (type AB) over a good portion of

[2]According to expert testimony, the population of the United States belong to four different blood types: 45 percent to group O; 40 percent to group A; 10 percent to group B; and 5 percent to group AB. Appellant has blood type O.

the belt in the trunk. The stains appearing on the floor mats and the throw rugs also proved to be human blood, covering all four blood types.

The van parked on the driveway showed three different human blood groups. The stains under the rear bumper were human blood of both groups A and O. The rubber gasket around the right door contained stains of human blood, group A. There were spots of human blood (groups B and A) inside the van.

There were human bloodstains (group O) on one of the two pairs of jockey shorts which were found along with the bolo knife and the nine millimeter shells in the imitation leather zipper bag under the front seat of the van. One of the rubber boots in the back of the van contained human blood, group A.

A later search of the little cabin which was located on the Sullivan ranch, and which was also under appellant's control, produced among other things three pairs of trousers and a pair of Levis. Similar to the items retrieved during the previous searches, the clothes in question all contained human blood. The spots on the trousers were human blood, group A, and the stains on the Levis were human blood, group B.

Microscopic examination of the hair found on the post-hole digger in appellant's garage reaffirmed that the hair was human. It was not appellant's hair, and had similarity to the head hair of victims Whitacre, Hocking, Riley, Allen, Wenzel and Shields. It also contained an actively grown hair follicle, showing that it had been forcibly removed.

The green ledger, sometimes called "death list," seized in the bedroom, furnished additional incriminating evidence against appellant. The ledger contained a number of names together with dates. Seven of these names were those of the identified victims.[3] It also included the name of one William Earl Vaughn who, although not an identified victim, had disappeared from the Marysville-Yuba City area, and also that of Jose

---

[3]The ledger contained, among others, the following entries:
"Warren Gerome Kelley March 30 1971 S.R.
"William Earl Vaguhan [sic] April 5 1971
"John H. Jackson April 15 1971
"Mark Beverly SHialds [sic] April 28 1971
"Sam Bonafiede May 6 1971
"May 11 Charles Linil Flemig [sic]
"May 12 Jona R. Smalwood [sic]
"May 15 Paul B Allen 71"

Romero Raya who, in a bar incident in which Corona was a suspect, had been savagely assaulted and seriously injured near the date indicated in the ledger. While the defense claimed that the ledger was not a complete list of the victims and was, or could have been, a business list showing the names and dates of the farm hands employed by Corona, significantly enough, the ledger in dispute contained no social security numbers, amounts of money due or paid to the laborers, or any other business-related entries. At the same time the prosecution proved by expert evidence that all the entries in the ledger and the immigration document were written by appellant in his own handwriting, and also that the entries were made by appellant's unique Universal six-color pen imported from Italy.

The additional circumstances shedding light on Corona's contact with the victims and his involvement in the crimes may be summarized as follows:

Byron Shannon, another labor contractor in the Marysville area, testified that on May 3 or 4, 1971, he met John Henry Jackson, victim 21, who was looking for a job. Before they could come to any arrangement, Corona came by. After a short discussion, Jackson was hired by Corona who drove him away in his pickup truck. This was the last time Shannon saw Jackson alive. A similar occurrence took place on May 12, 1971. On that occasion Shannon was talking to Smallwood, Riley and Allen (victims 15, 16 and 17) in lower Marysville. Appellant drove up in a pickup truck and asked Smallwood, Allen and Riley if they wanted to work for him. They accepted the job offered by Corona and all left in appellant's truck. Shannon never saw any of the three men again.

On April 10, 1971, about 3:30 or 4 p.m., James Pervis, a farm laborer, was walking on the road between Yuba City and Marysville. Appellant drove alongside the road and asked Pervis if he wanted to work for him for a couple of hours. Pervis refused and appellant drove away after some hesitation. Evidence introduced at the trial showed that appellant in fact did not start providing laborers for thinning until about May 6.

Jose Romero Raya testified that on the evening of February 24, 1970, he was approached by appellant near the Guadalajara Cafe. Raya was with one Nick Ramirez. Appellant asked the two men if they wanted to do some pruning work on the Sullivan ranch the next day. On answering that they did not know where the Sullivan ranch was, appellant volunteered to take the two men to the ranch in his pickup truck at that late hour. The evidence adduced at trial established that at the time

appellant offered Raya and Ramirez the pruning job on the Sullivan ranch, he was neither contracting nor working at the ranch and in fact he had not had a contract for pruning since the winter of 1968-1969.[4]

Appellant's activities around the gravesites were further described by two eyewitnesses, Jacob Compton and Ernesto Garcia. Compton was an engineer for the California Department of Water Resources working on the Sullivan ranch from April through June 1971. On April 28 or 29, Compton saw a light colored van in the area. The van showed up twice on the same day. At mid-morning he saw the van come out of the brush into the bend of the river somewhat to the west of gravesite 21. In the afternoon Compton saw the van traveling along the road in the same area. Garcia testified that in April 1971 he was operating a tractor with a chisel in the south river bottom prune orchard. Appellant was working on the ranch that day, cutting trees near the camp. Appellant approached Garcia and asked him how deep the chisel would go. Garcia told appellant the chisel went about three feet deep. Appellant put his hand next to the chisel and marked the dirt line which showed how deep the chisel penetrated the ground.

Finally, the jury heard the testimony of Mrs. Beatrice Valdez, appellant's neighbor in Yuba City. Mrs. Valdez worked in her yard almost every evening during January and February 1971. She observed appellant driving past almost every evening somewhere between 6:45 and 7, and returning within two to two-and-a-half hours. Appellant did not always use the same vehicle. Sometimes he drove the Impala, sometimes the van or the pickup. On returning, he usually washed his vehicle. However, as Mrs. Valdez often noticed, the job done by appellant was not complete. Instead of washing the car in full, he frequently did no more than hose out the *inside* of the vehicles.[5]

---

[4]It is noteworthy that Raya's name appeared on page 50 of appellant's ledger, together with the date "Fev. 24 1970," the day Corona had asked Raya to accompany him to the Sullivan ranch. Both the date and Raya's name were written in the ledger in the manner it would have been written in Mexico (cf. "Jose Romero R.").

[5]The record reads in part as follows: "Q. All right. And did you ever see him doing anything in the way of washing. . . . A. Yes, I saw him several times—well, I wouldn't say washing like you normally would your car like soaping it down or something. *I would say I saw him several times with the hose and he was just washing the inside, this was all.* Q. He was just washing—A. Yes, he was doing that. He had—he was just—he just had the hose in his hand and the back doors were open to the van. . . . Q. *And you say*—let me see if I get you right—*he wasn't washing the outside of the van?* A. *No, not like you normally would soap down your car on the outside and continue in the interior. He would just be squirting the car on the inside with the hose.*" (Italics added.)

Despite the aforestated wide ranging and elaborately woven web of circumstantial evidence connecting appellant to the crimes and unerringly pointing to his participation in their commission, trial counsel for appellant failed to raise the obvious alternative defenses of mental incompetence (Pen. Code,[6] § 1368) and/or diminished capacity[7] and/or legal insanity (§ 1026). Still worse, trial counsel failed to present any meaningful defense at all. After a lengthy trial, lasting several months, in which the prosecution produced more than 100 lay and expert witnesses and put in an immense wealth of documentary evidence, defense counsel failed to call a single witness on his client's behalf, and submitted the case basically upon the evidence produced by the prosecution. After a relatively short deliberation, lasting approximately five days, the jury brought in its verdicts finding appellant guilty of first degree murder on all 25 counts charged.

Although appellant assails the judgment of conviction on a number of other grounds as well,[8] the central contention advanced in the appeal and

[6]Unless otherwise indicated, all references will be made to the Penal Code of California.

[7]From the standpoint of trial strategy, we recognize that the issue of diminished capacity involves very different considerations than either mental incompetency under section 1368 or insanity under section 1026. In other words, the injection of diminished capacity is generally a tacit admission by a defendant that he committed the act in question but is less culpable or responsible because of the diminished capacity to formulate a requisite mental element of the crime. While petitioner-appellant has focused on the sections 1368 and 1026 defenses, we included the inquiry concerning diminished capacity in our order directing the evidentiary hearing. We did so because clearly in the face of the medical and psychiatric evidence which existed, an investigation into the feasibility and advisability of a diminished capacity defense should have been carried out (*In re Saunders* (1970) 2 Cal.3d-1033, 1041-1042 [88 Cal.Rptr. 633, 472 P.2d 921]). In short, counsel cannot excuse failure to assert a defense on the basis of tactics or strategy unless and until he has conducted the necessary legal and factual investigation which would enable him to make a rational, informed decision. The record is crystal clear, as we shall point out, that no such investigation was ever carried out by counsel. Consequently, on remand it will be incumbent on trial counsel to perform this duty.

[8]It is argued inter alia that:

(1) The trial court committed error in disallowing appellant to present evidence challenging the truthfulness of affidavits supporting the various search warrants issued;

(2) The failure of the trial court to hold a *sua sponte* evidentiary hearing on appellant's mental incompetence (§ 1368) constituted reversible error;

(3) The trial court erred in denying appellant's discovery motion for information regarding prospective jurors;

(4) Appellant's right to a fair trial was violated (a) by the all-pervasive pretrial and trial publicity; and (b) by the failure of the prosecution to produce discoverable information and other materials in a timely manner;

(5) The admission of witness Raya's testimony that appellant offered him employment was prejudicially erroneous;

(6) The prosecutor's comments on appellant's failure to take the witness stand violated

petition for habeas corpus is that appellant was deprived of effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

The background facts giving rise to appellant's contention may be described as follows: Corona was represented at the trial by Richard E. Hawk, a privately retained sole practitioner. Since Corona was not able to pay the substantial amount of attorney's fees chargeable in a case of such magnitude, a fee agreement was entered into between the parties. Pursuant to the agreement, Hawk was granted exclusive literary and dramatic property rights to Corona's life story, including the proceedings against him, in return for legal services. Under the agreement, Corona expressly waived the attorney-client privilege, thereby removing any impediment to the publication of the most intimate and confidential details of his life and his trial. The surrender of all-inclusive publication rights and the attorney-client privilege was irrevocable and in perpetuity binding not only on Corona, but also his heirs, executors, legal representatives and assigns. The income derived from the publications was to inure solely and exclusively to Hawk.[9] In the wake of the agreement, Hawk hired Ed Cray, a professional writer who participated in the proceedings as Hawk's investigator and sat at the counsel table during the trial. Well before the commencement of the trial, Cray and Hawk entered into a contract with the MacMillan Publishing Company to publish the book to be written about Corona and his trial. The book, entitled *Burden of Proof, The Case of Juan Corona,* authored by Cray and supplemented by Hawk's afterword, was published just a few months after the completion of the trial.

the rule laid down in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229];

(7) The endless series of prosecutorial misconduct denied appellant a fair trial; and, finally,

(8) The judgment of conviction is infirm because it is not supported by substantial evidence.

[9]The pertinent provisions of the fee contract which became a part of the record by virtue of the consolidation of the appeal and the petition for habeas corpus (cf. *In re Hwamei* (1974) 37 Cal.App.3d 554 [112 Cal.Rptr. 646]; *People* v. *Pena* (1972) 25 Cal.App.3d 414 [101 Cal.Rptr. 804]) read as follows:

"1. *I hereby grant to you the exclusive and irrevocable literary and dramatic property rights in and to my life story* and any part or portion of my life story, *and any incidents thereof, both present and future.*

"2. In connection with the aforementioned grants to you of literary and dramatic property rights, *I hereby grant to you the exclusive and irrevocable right to use my name,* or any variant thereof, and to use *my likeness, or any simulation thereof, and the exclusive and irrevocable right to portray events contained in or related to my life* as part of and/or in connection with all or any of the following exclusive, irrevocable, and worldwide rights *in perpetuity:*

Based upon the foregoing facts, appellant claims that a pervasive and inherent conflict of interest was created between himself and his trial attorney which compromised trial counsel's ability to provide an adequate legal representation in the case. Thus, it is urged that while appellant's interest would have dictated the invocation of *all* defenses available, including the defenses of mental incompetence (§ 1368) and legal insanity (§ 1026), even if these defenses had limited the scope of the trial or obviated it altogether (e.g., a successful hearing under § 1368), trial counsel's financial stake in the literary contract called for just the opposite measures, i.e., to insist on holding a lengthy and sensational trial at any price; to create as much trial publicity as possible; and, as a result, to increase the financial potential of the acquired publication rights and his personal monetary benefits flowing therefrom.

Reduced to definable legal terms, appellant's contention in effect is twofold. One, the judgment of conviction should be reversed for lack of

"a. All book, magazine, and any other rights in any form of the written media, including all publication and copyright rights therein;

"b. All motion picture and television rights, including all film, television, tape, cassette, and/or other means of recording, whether electronic or otherwise;

"c. All radio rights, and all other rights to mechanically produce, reproduce and license the reproduction of spoken words, including phonograph record, tape, cassette, or other means of reproduction, taken from, or based upon any of the results or proceeds of the exercise of any of the other rights granted herein; and

"d. The exclusive right to perform any version of the results and proceeds of the rights herein granted by means of and by the use of living actors, whether upon the legitimate stage, by means of television, or by any other means now known or hereafter devised.

"The foregoing enumeration of rights contained in this paragraph is by way of description only, and not by way of limitation. It is my intention to grant to you all of the literary, dramatic and other related and incidental rights in and to my life story, and any portion or incidents thereof, and any and all incidental rights related thereto. *The foregoing grant, which shall be exclusive, irrevocable, worldwide and in perpetuity,* is more fully expanded, though not by way of limitation, in Exhibit 'A' attached hereto, and by this reference is incorporated herein as though set forth in full at this point."

"5. *I hereby expressly waive any rights I may have under the so-called attorney-client privilege as to any matter heretofore or hereafter related* to you by me, or any of the work product developed by you in the performance of your services for me or otherwise, and I expressly grant to you the right to use any of such material as part of and in connection with any of the other rights granted to you herein."

"7. *I acknowledge* and represent *that I am not* entitled, and shall not become entitled, *to any income,* or any portion thereof derived or *to be derived by you,* directly or indirectly, *through the exercise of the rights herein granted* to you, whether such exercise of rights shall be by you or by anyone authorized by you or directed by you, and whether now or at any time in the future."

"9. *The provisions of this grant of rights shall be binding upon me and my heirs, executors, administrators, legal representatives and assigns,* and the rights herein granted to you may be assigned by you to any person, firm or corporation, in whole or in part, and may be exercised by you or by your direction in any manner you may desire whatsoever." (Italics added.)

adequate legal representation on the traditional basis: namely, that due to the ineffectiveness of trial counsel crucial defenses were withdrawn from the case which rendered the trial a " 'farce or a sham' " (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]; *People* v. *Stanworth* (1974) 11 Cal.3d 588, 612 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Jenkins* (1975) 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857]). Two, the conflict of interest brought about by trial counsel made the trial inherently unfair, which requires reversal under the Sixth and Fourteenth Amendments, either per se or by showing some prejudice stemming from the conflict. Each ground relied upon by appellant will be separately analyzed and discussed.

■ (A) The traditional rules relating to inadequate legal representation, of course, are well settled. As repeatedly pointed out, the constitutional right to assistance of counsel in a criminal case includes the guarantee that such assistance be "effective" (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]; *Powell* v. *Alabama* (1932) 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527]; *People* v. *Ibarra, supra,* 60 Cal.2d at p. 464). The "effective" counsel required by due process, however, is not errorless counsel; rather, it is counsel reasonably likely to render, and rendering, reasonably effective assistance (*Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 37; *People* v. *McDowell* (1968) 69 Cal.2d 737, 748 [73 Cal.Rptr. 1, 447 P.2d 97]; *In re Williams* (1969) 1 Cal.3d 168, 176 [81 Cal.Rptr. 784, 460 P.2d 984]).

Although the determination of whether the demands of due process have been met in a particular case is always a question of judgment and degree to be answered in light of all the circumstances and with a view to fundamental fairness, certain general standards have evolved for the aid of the court making this determination. ■ *Fundamental among these is the duty of counsel to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf,* both at the pleading stage (*Von Moltke* v. *Gillies* (1948) 332 U.S. 708, 721 [92 L.Ed. 309, 319, 68 S.Ct. 316]; *Wilson* v. *Rose* (9th Cir. 1966) 366 F.2d 611; *In re Williams, supra,* 1 Cal.3d 168, 174-176), and at trial (*People* v. *McDowell, supra,* 69 Cal.2d 737; *People* v. *Welborn* (1967) 257 Cal.App.2d 513 [65 Cal.Rptr. 8]). *If counsel's failure to undertake such careful inquiries and investigations of the facts or law results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled* (*In re Saunders* (1970) 2 Cal.3d 1033, 1041-1042 [88 Cal.Rptr. 633, 472 P.2d 921]; see also *Brubaker* v. *Dickson, supra,* 310 F.2d 30, 38-40; *People* v.

*Ibarra, supra,* 60 Cal.2d 460, 464; *In re Williams, supra,* 1 Cal.3d at p. 175).

■ The decision not to raise a defense, of course, may be fully justified on the basis that it was made deliberately as a matter of trial strategy or tactics. Such decision, whether wise or unwise, when viewed with benefit of hindsight, may not be second-guessed or disturbed by the reviewing court. However, even the tactical and strategic determinations of trial counsel must have some rational support founded on reasonable, sound, legal principles and fully developed facts. ■ Therefore, when trial counsel fails to acquire facts necessary to a crucial defense or to follow the facts already in his possession or to develop facts to which his attention is called, or when he fails to do the requisite legal research to learn the applicable law, his failure to raise a defense or defenses which could have been established by making the aforestated requisite efforts cannot be justified by reference to trial strategy or tactics (*In re Saunders, supra,* 2 Cal.3d at pp. 1042, 1049; *People* v. *Ibarra, supra,* 60 Cal.2d 460; *In re Williams, supra,* 1 Cal.3d at p. 177).

■ The record before us, including the transcript of the evidentiary hearing conducted by a referee on April 11 through April 13, 1977,[10] shows as a demonstrable reality (*People* v. *Martinez* (1975) 14 Cal.3d 533, 538 [121 Cal.Rptr. 611, 535 P.2d 739]; *People* v. *Strickland* (1974) 11 Cal.3d 946, 956 [114 Cal.Rptr. 632, 523 P.2d 672]; *People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820]) that trial counsel in gross neglect of his basic duty, failed to conduct the requisite factual and legal investigation in an effort to develop fundamental defenses available for his client and as a result of his neglect, crucial defenses were withdrawn from the case.

An analytical review of the evidence which was either in Hawk's possession or which could have been acquired by him by the exercise of due diligence shows the following factual situation: As far back as 1956, Corona, then age 22, was admitted to the DeWitt State Hospital as a mental patient. He was in a delusional, confused state. He believed that everyone in the area had drowned in the "flood." He read the Bible all day, and wrote all the time. He insisted that a Mexican doctor at one time

---

[10]As noted before (fn. 9), we have consolidated the appeal and the habeas corpus petition for a single determination. In addition, in order to determine whether appellant's claim of inadequate legal representation (raised both in the appeal and the petition) was well founded, we followed the practice suggested by the cases and appointed a referee for the purpose of taking evidence concerning the representation afforded to appellant-petitioner (*People* v. *Pena, supra,* 25 Cal.App.3d 414, 423).

had ·sterilized him, and that·the doctors at the hospital had tried to gas him. He was diagnosed as a paranoid schizophrenic or a schizophrenic with catatonic features. He stayed in the hospital, receiving high dosages of Thorazine and electric shock treatments, from January to April 1956.

Although in April 1956 appellant was discharged from the hospital as recovered, psychiatric examinations conducted later indicated that his mental illness was far from being over. On June 3, 1971, while in custody, Corona was examined by Dr. Joseph Catton, a Los Altos, California, psychiatrist. Dr. Catton's examination revealed that during the year before the commission of the crimes charged, Corona had been suffering from renewed hallucinations. In 1970, on a trip to Mexico, while traveling on a bus, he looked towards the hills and saw his deceased godfather who appeared to be talking to him. At another time he maintained that he had seen and met people in certain places which, in fact, had not happened. In his written notes, Dr. Catton concluded that appellant's schizoid personality was still apparent during the June 3, 1971, examination. Dr. Catton doubted that appellant could at that time assist his counsel in the preparation of his defense, and recommended that appellant be sent to a state psychiatric institution for further observation and examination.

Between August 7 and September 12, 1971, Corona was examined in jail by Dr. Valentino Andres, another psychiatrist. In his report, Dr. Andres confirmed Dr. Catton's finding that Corona was suffering from hallucinations and delusions. The report noted that at the August 24, 1971, examination, Corona stated that he was always thinking about his return to jail and his understanding was that at the end of three weeks he would be returned to jail. As a result of a series of psychiatric examinations, Dr. Andres found that Corona suffered from aggravated psychosis ("psychosis in exacerbation"), his insight was slight, and his judgment impaired. In remedying the exacerbated psychosis, Dr. Andres increased the dosage of Thorazine, an antipsychotic drug from 300 milligrams to 500 milligrams per day for the first time, and later, at the peak of the illness, to a total of 1,400 milligrams per day. At the same time he recommended that appellant be placed in the Atascadero State Hospital until the psychosis was in complete remission.

Additional medical evidence in Hawk's possession or at his disposal consisted of the findings of two other psychiatrists, Dr. Sheppard and Dr. Bromberg. Although these two medical experts failed to discern an *active*

psychosis at the time of their examinations, Dr. Bromberg, who examined appellant in the Yuba County jail on June 5 and 7, 1971, observed the remnants of Corona's old schizophrenic illness (the so-called "schizophrenic scars") which were manifested by the existence of noticeable neurotic trends and phobias. And, in a letter dated March 20, 1972, Dr. Sheppard concluded that Corona constituted a hazard to himself and others, and recommended that he be committed for observation to the California Medical Facility.[11]

The opinions of the medical experts were supported by the observations of lay witnesses. Thus, Raymond Duron, who was a general foreman on the Sullivan ranch and personally acquainted with appellant, advised Detective Sergeant Purcell that Corona was mentally ill. Likewise, Sheriff Whiteaker, another lay person, stated in an affidavit filed with the court that in his opinion "the nature of the wounds and their savagery, the disposition of the bodies of the murder victims, and the she*ar* number of victims indicates that the perpetrator of these

---

[11]Since Hawk claimed that he failed to invoke the mental incompetence, diminished capacity and/or legal insanity defenses mainly because of the Sheppard and Bromberg reports (see discussion, *infra*), we set out the relevant portions of those reports at length. In his March 20, 1972 letter, Dr. Sheppard stated:

"On the above date I examined Mr. Juan Corona in the Sutter County Jail at your [the sheriff's] request for the purpose of a psychiatric evaluation in order to determine whether or not he presently constitutes a hazard to himself or others.

"During the hour I spent with Mr. Corona I found him to be cooperative and affable, conventionally oriented, and in possession of an intact memory for both recent and remote events. He denied both visual and auditory hallucinations. No evidence of delusional thinking was elicited. His sense of humor is impaired and his mood is decidedly depressive. *There is no evidence of psychosis at this time. He is alleged to be receiving heavy doses of Thorazine.* He appears to be in need of Artane or similar medication to prevent the complications of extra-pyramidal symptoms.

"Diagnosis: Adjustment Reaction of Adult Life (307.3).

"In view of the current depression *it is my opinion* based upon reasonable medical probability *that Juan Corona does presently constitute a hazard to himself or others. It is further my opinion that he would benefit from* a 1203.03 P.C. *commitment for ninety days observation at the California Medical Facility.*" (Italics added.)

The summary of the Bromberg report read as follows:

". . . *This individual is not psychotic now,* he is able to confer with Counsel in his Defense and understand the charges brought against him. *This patient demonstrates neurotic tensions, phobias, vague depressive feelings,* which are in the setting of an ongoing personality concerned with practical realities. In this respect, the clinical examinations were confirmed by the various psychological tests.

"The latter did not show any gross disturbances but the various underlying neurotic trends are noted previously.

"*These neurotic trends and phobias are related to his old schizophrenic illness which* cleared up in the main: it *is often called "schizophrenic scars."* They do not, however, interfere with his everyday activities.

"There is no physical or neurological difficulty in this man." (Italics added.)

offenses is at least seriously mentally ill and probably a homicidal maniac."

■ To sum it up, appellant's mental competence, capacity, and legal sanity were called into question by (1) the very nature of the crimes, i.e., the senselessness and savagery of the murders committed without any apparent motivation (cf. *In re Hwamei, supra,* 37 Cal.App.3d 554, 561-562); (2) the mental history of Corona, showing the existence of schizophrenia, paranoia and psychosis as far back as 1956; (3) the result of current psychiatric examinations conducted by several psychiatrists in 1971-1972, which confirmed one way or another the recurrence of Corona's old mental illness; (4) the high dosage of Thorazine administered to the patient, which by itself was indicative of the seriousness of the current psychosis; and finally (5) the almost unanimous recommendation of psychiatrists that Corona be placed in a mental institution for further observation, examination and treatment.

These circumstances, singly and in combination, provided sufficient facts to raise serious doubts as to Corona's mental condition and imposed upon trial counsel the duty to follow the factual leads already furnished, to investigate and look into the meaning of the medical diagnoses and findings already on record, and to seek, if necessary, further psychiatric testimony with a view to establishing the mental incompetence, diminished capacity and/or legal insanity defenses (*In re Saunders, supra,* 2 Cal.3d at pp. 1041-1042). The record, especially the evidentiary hearing transcript, clearly indicates that trial counsel took none of the steps mandated by law.

Thus, the record discloses that Hawk never consulted Dr. Andres in order to figure out to what extent Corona's judgment was impaired or to seek further explanation of the meaning of "psychosis in exacerbation" or to get to know the reason why Dr. Andres recommended appellant's mental hospitalization. By a simple consultation with Dr. Andres, Hawk would have learned that during the August 8, 1971, examination, Corona was acutely psychotic; was unable to complete a thought; was suffering from paranoid ideation which, in simple terms, meant that he was out of touch with reality. He would also have learned that the Thorazine administered to Corona is an antipsychotic drug; that the highest dose given to Corona from September 1971 was a total of 1,400 milligrams a day, which was an outrageously high dosage for a human being to take; that the effect of 25 milligrams of Thorazine administered to a person not suffering from acute psychosis would be so great as to cause him to sleep

for about three days. All Hawk did with regard to the Andres report was to ask Dr. Leavenworth, a general practitioner, what "psychosis in exacerbation" meant. Even though Dr. Leavenworth advised him that this indicated that Corona's psychosis was becoming active again, Hawk did not pursue the matter any further.

When questioned about Dr. Catton's medical data, Hawk gave an ambiguous answer as to whether or not he was aware of said material. However, the record unerringly indicates that Hawk knew about the fact that Dr. Catton had visited and examined Corona in the jail. In point of fact, there is evidence that Hawk admonished Dr. Catton not to continue these jail visits. Also, the record lodged with the court shows that in a prosecution motion for a subpoena duces tecum filed on February 28, 1972, Dr. Catton was ordered to attend as a witness and to produce all records, reports and memoranda made in connection with Corona's mental examination. It is thus clear that Hawk was put on notice of the existence of medical data resulting from Dr. Catton's mental examination of Corona. By making due effort to obtain this data and/or to consult Dr. Catton who was one of the foremost authorities in forensic psychiatry, Hawk would have learned that on June 3, 1971, appellant's paranoid and catatonic schizophrenic break which had been indicated in the 1956 DeWitt Hospital record, recurred, and Corona was suffering again from an altered state of consciousness and an inability to control himself. The medical opinion of Dr. Catton was also explicit that doubt existed as to whether Corona was able to assist counsel in his defense, which would have provided invaluable evidence as to a section 1368 mental incompetence hearing (see discussion, *infra*). Finally, by making further investigation, Hawk would have learned that Dr. Catton was of the opinion that in order to fully evaluate the mental competence, capacity, and sanity of appellant, a series of questions needed to be answered and that this was the reason why Dr. Catton suggested that Corona be placed in a mental hospital for further examination.

Trial counsel's claim that the reports of Drs. Andres and Catton were superseded by the findings of Drs. Sheppard and Bromberg and would not have been useful in establishing any of the mental state defenses, is entirely unfounded and must be rejected for a number of considerations.

One, as pointed out earlier, Dr. Sheppard's report was far from being definite and clearcut. While Dr. Sheppard concluded in his March 20, 1972, letter that Corona did not appear psychotic or hallucinatory at that time, he hastened to add that at the time of the examination appellant

was under heavy doses of Thorazine; was in a depressive mood; constituted a hazard to himself and others, and recommended appellant's commitment to a mental institution for further observation. (See fn. 11, *ante.*) Moreover, if consulted, Dr. Sheppard would have explained to trial counsel (as he did at the evidentiary hearing) that the conclusion reached in his report was tentative; that he had only one hour to examine the patient; and that due to the shortness of time he could not establish Corona's mental status in full. These were the primary reasons why he concluded that further psychiatric evaluation of the patient was imperative.

Two, the report of Dr. Bromberg also fails to support trial counsel's decision to forego the crucial defenses based on appellant's mental condition. As noted before, the report itself indicates that the "patient demonstrates neurotic tensions, phobias, vague depressive feelings," and that the "neurotic trends and phobias are related to his [the patient's] old schizophrenic illness which . . . is often called 'schizophrenic scars' " (see fn. 11). These psychiatric phrases appearing in the record are, of course, not self-explanatory. They are terms of art requiring expert explanation, if their proper meaning and import are to be understood and resolved. Nonetheless, Hawk failed to make any further inquiries or investigation and, in fact, refused to permit any psychiatric inquiry to be conducted. He did not look into the medical data and test results upon which the report was founded. He failed to interview Dr. Bromberg to seek a verbal explanation as to the meaning of the words used in the report. In fact, he did not contact Dr. Bromberg until September 1972, well over a year after the submission of the report. Even at that late date, he spent only about 20 minutes without even attempting to discuss the meaning and content of the report.

Dr. Bromberg's testimony at the evidentiary hearing demonstrates that the information to be given by Dr. Bromberg would not only have been instructive, but absolutely crucial for trial counsel in making an intelligent and informed decision whether or not one or more mental defenses should be invoked. Thus, Dr. Bromberg stated that he did not feel that the examination conducted by him was completely thorough, because Corona held back a great deal of information and prevented him from getting into his inner feelings or psyche. For this reason alone, he expected that Corona would be examined further. But, despite the obvious obstacles which precluded him from getting past the facade of the patient, Dr. Bromberg nevertheless discovered certain indicia pointing to appellant's psychological disturbances, i.e., Corona's unreasonable

fear of rising waters and his morbid, masochistic ideas towards viewing objects that were decaying or deteriorating.

Dr. Bromberg believed that Corona's fear of a flood, 16 years after his hospitalization, was tied to an acute psychosis which could have been either delusional or a serious phobia. Tendency to view decayed or deteriorating objects is also often characterized as a hallmark of psychosis. In answering questions, Dr. Bromberg explained that "schizophrenic scars" referred to in his 1971 report meant remnants or residue of a past schizophrenia which flare up in later life—frequently under pressure; that paranoid schizophrenia is one of the mental illnesses that fits into psychosis; and that psychotic persons are frequently not aware of the reality around them. Finally, Dr. Bromberg expressed his opinion that due to the fluctuating nature of psychosis and schizophrenia a psychiatric report could not be relied upon for more than three months without a reexamination of the patient.[12]

Three, in addition to the foregoing, there are two major considerations why the Sheppard and Bromberg reports could not be relied upon by trial counsel in surrendering appellant's right to the mental defenses in dispute. In the first place, two other physicians, Dr. Leavenworth and Dr. Prout, who had treated appellant during the relevant period and had been called upon by Hawk to prevent any psychiatrist from seeing and examining Corona, testified at the evidentiary hearing that in their opinion additional psychiatric inquiry was warranted with respect to appellant.[13]

---

[12]The illustrative portions of the record read as follows: "Q. Dr. Bromberg, your report is dated June 15th, 1971, correct? A. Yes. Q. And it's—the records show that the trial of Mr. Corona began in September of 1972. Would your report—*could your report be relied upon a year and a half later,* a year and a quarter later, in September of 1972, as an accurate measure of Mr. Corona's competence to stand trial at that time in September of 1972? A. *No,* I would certainly like to re-examine him to make a decision in September of 1972. A year and a half of incarceration certainly has an effect on a person. Q. *Could your records be relied on a year after it?* A. *No, my experience—three months*—oh, at least three months *after any given examination there should be a re-examination on that issue.* Q. *Were you ever asked to make such a re-examination? . . .* A. *Not in this case, no.*" (Italics added.)

[13]Colloquy between counsel and Dr. Prout: "Q. And generally when a person suffers this situation, assuming it's existing, isn't it a good idea to have a psychiatrist work with an individual in this situation? A. Yes, I think so. If I didn't say it previously, *I will say that I certainly would have called in a psychiatrist for consultation had I not been essentially precluded from doing so by Mr. Hawk.*"

Colloquy between counsel and Dr. Leavenworth: "Q. *Did you believe additional psychiatric inquiry was warranted in Mr. Corona's case?* A. *I thought so.*" (Italics added.)

Dr. Hooker, a psychologist who examined Corona on behalf of the defense, also raised serious questions concerning the mental condition of the accused, and described him as paranoid, pathological and borderline psychotic.

In the second place, the Sheppard and Bromberg reports dealt only with the narrow issue of appellant's mental competence under section 1368 and failed to explore either diminished capacity or the legal sanity question under section 1026. As a consequence, these reports at best could only have dispelled the mental competence defense and served no justification for giving up the defenses of legal insanity and/or diminished capacity. ▮ It is, of course, elementary that the legal defense based on insanity embraces a question different from diminished capacity and/or the defense of mental competence. While the latter encompasses the determination whether at the time of the trial a defendant is able to understand the nature and purpose of the proceedings against him and to assist his attorney in the conduct of a defense in a rational manner (*People* v. *Laudermilk* (1967) 67 Cal.2d 272 [61 Cal.Rptr. 644, 431 P.2d 228]; *People* v. *Aparicio* (1952) 38 Cal.2d 565 [241 P.2d 221]), the section 1026 issue poses the distinct and separate question of whether a defendant had capacity sufficient to distinguish between right and wrong[14] (*People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Foster* (1969) 271 Cal.App.2d 763 [76 Cal.Rptr. 775]), or as Dr. Bromberg put it, whether defendant was "irresponsible" at the time of the commission of the crime. ▮ This issue was not addressed or dealt with in either the Sheppard or Bromberg report. At the evidentiary hearing Dr. Bromberg explicated that he had not been asked to examine Corona with respect to his legal sanity under section 1026, and that had he been requested by defense counsel to do so, he would have explored the matter by conducting further examinations, because, based upon the medical data at his disposal, such inquiry was fully warranted.[15]

[14]Under California law, which applies a variant of the M'Naughton formula, to be sane and thus legally responsible for the act committed the defendant must be able to know and understand the nature and quality of his act and to distinguish between right and wrong at the time of the commission of the offense (*People* v. *Wolff, supra,* at p. 801).

[15]The record sets out in part as follows: "Q. What is the first step a lawyer normally takes, lawyers that you have worked with in these cases, in getting into cases involving the psychiatric defense? . . . Is it normally the 1368 question, the competency to stand trial, that's the first issue that's addressed? A. That's the first one I would say, yes. Q. And what issue follows after that? A. Well, then if the man is not competent, then there is either further treatment in a hospital or observation, or if there is any question about it, and then, of course, the question of irresponsibility at the time of the crime, which is less frequent than the incompetency. Q. Now, I think you used the words, 'Irresponsibility at

■ It is contended, however, that the failure of trial counsel to invoke any of the mental incompetence and legal insanity defenses was due to tactical or strategic decision. Indeed, Hawk spelled out at the evidentiary hearing that he *deliberately* prevented putting appellant's mental state in issue because he thought Corona was innocent; the prosecution had a flimsy, circumstantial case; and the raising of appellant's mental state would have provided the missing motive and thereby would have helped the prosecution prove its case. For these reasons, plus the all-pervasive publicity attending the trial, he forbade any further psychiatric examination of his client, opposed the mental competence hearing and refused to enter the alternative plea of "not guilty by reason of insanity."[16] The position taken by trial counsel is totally unfounded and must be rejected for multiple reasons.

■ As a threshold matter, we emphasize that according to the principles discussed *ante,* the tactical or strategic decisions of the trial attorney must be based on a reasonable, rational foundation, both

---

the time of the crime.' What does a psychiatrist in your position normally do in trying to determine whether there was irresponsibility at the time of the crime? A. At the time of the crime. Well, first you make a mental examination and try to reconstruct what happened at the time of the crime, which is often weeks or months later, and then try to analyze the personality to understand something of the motivation, if there is that, and reconstruct the picture to see what you can think happened at the time when you were not, of course, present, but whether. this is a continued psychosis or a temporary one or remission or whatever. Q. Did you take these steps in this case? A. I don't think I went that far. . . . There was a change of attorneys, and I was not consulted any further. Q. *Did you think from your first interviews that there was a basis for investigating and taking these further steps that you have just outlined?* A. *If I were asked* to answer the questions of the responsibility—or *the irresponsibility at the time of the crime, I would have gone on with it,* possibly with a more knowledgeable Interpreter, *but I would have gone—gotten more information. . . .*

"Q. *Do you think that it was indicated in this situation in Petitioner's particular situation, that an investigator, psychiatric investigator, should go on and evaluate these tendencies that you noted in your report?* A. *Well, in response to a lawyer's request, I think it would be indicated.* But as a private investigator, that is to say, a psychological investigator, it would be a matter of whether I had a chance to study the case further and for what purpose. Q. *If you had been asked by Mr. Van Den Heuvel or Mr. Hawk as to whether you should go on, would you have advised them to go on?* A. *I would have, yes."* (Italics added.)

[16]By way of illustration, we set out the following excerpts from the record:

"Q. *What were your reasons for opposing the* [§ *1368*] *motion?* A. *Because I didn't want*—I didn't want *the media to* in any way *get the idea that Judge Hauck entertained any suspicion about Juan's mental capacity."*

"Q. What were you concerned—what type of information did you not want to get to the media? A. I didn't want the media to know there were any psychiatrists coming to see him. I didn't want them to know there was anything about a 1368 pending or the Judge was even thinking about it. Q. *What harm did you think such information would have done?* A. *It would have supplied the motive for the crime. If you have a. nut, you don't need a motive."* (Italics added.)

factually and legally, in order to be valid and invulnerable. In the instant case, however, the record disproves the requisite rational support for Hawk's decision with regard to both the facts and the legal principles applicable to the case.

First, the evidence as a whole attests to the fact that shortly after taking over the defense from the previous trial counsel, Van Den Heuvel, and even before seeing or getting acquainted with Corona's medical record, Hawk made a factually unsupported predetermination that the possible defenses premised on Corona's mental condition would not be utilized. On or about June 16, 1971, when interviewed by newspaper reporters, Hawk declared "I don't intend to have him [Corona] plead not guilty by reason of insanity." At the evidentiary hearing Hawk reaffirmed that at the time his statement to the press was made he had not read Dr. Bromberg's report (or any other medical reports for that matter) and his decision was based solely upon his interview and conversation with Corona.[17]

Second, as detailed above, Hawk acted as the sole determiner of Corona's mental state without the advice and help of experts. He adamantly refused to discuss and analyze the medical reports and the underlying test data with the psychiatrists conducting the tests and examinations with the exception of Dr. Hooker, who, as noted before, also described appellant as paranoid and schizophrenic; consistently neglected to follow the near unanimous recommendation of experts to place Corona in a mental institution for further examination; neglected to follow the factual leads furnished in the reports for the purpose of developing further evidence and establishing the possible mental defenses based thereon; failed to properly evaluate and utilize even the medical data already acquired; and ultimately went so far as to prohibit any further psychiatric examination or evaluation of appellant. Therefore, what was said in *In re Saunders, supra,* 2 Cal.3d 1033, 1048-1049, where trial counsel failed to raise diminished capacity as a defense without making sufficient factual investigations and inquiries, is applicable here with equal force: "It is also established, however, that counsel's decision was made without the benefit of substantial factual inquiry into the specifics of petitioner's mental condition. .... *Although counsel's decision not to raise the defense* of diminished capacity on petitioner's

---

[17]The pertinent part of the record reads as follows: "Q. Did you at the time you made the statement to the press have the medical reports of Dr. Bromberg? A. I doubt it. Q. Thank you. A. But I talked to Mr. Corona. Q. But you did not have the medical reports—A. No."

behalf *was made for 'tactical' and 'strategic' reasons sufficient in counsel's judgment to support it,* in the circumstances of this case *the failure of counsel to avail himself of information relevant to the defense removed all rational support from that decision . . . . It must therefore be concluded* on this record *that the possible defense* of diminished capacity *'was withheld not through deliberate though faulty judgment, but* in default of knowledge that reasonable inquiry would have produced, and hence *in default of any judgment at all.'* [Citation.]" (Italics added.)

Third, Hawk's so-called "tactical" decision was unjustified for the further reason that it is blatantly lacking in sound legal foundation. The assertion that the invocation of the mental incompetence and legal insanity defenses, of necessity, would have worked for the benefit of the prosecution and would have lightened its burden of proving appellant's guilt by providing the missing motive for the killings is predicated on the obviously erroneous legal assumption that the determination of the defendant's guilt, his mental competence to stand trial, and his legal sanity take place in a single, inseparable procedure and that the jury deciding the issue of guilt would necessarily be contaminated by evidence of, or reference to, the mental issues.[18] ■ In reality, the law is well established that the procedure designed to resolve defendant's present sanity under section 1368 is entirely separate from the trial adjudging the guilt or innocence of the accused, and that the adjudication of a defendant's legal sanity under section 1026 also takes place in a separate phase of a bifurcated trial.

Thus, it bears special emphasis that, pursuant to the explicit provisions of the statute, a defendant's mental competence must be determined in a separate hearing held before a judge or a jury (if a jury is requested) impanelled solely for that purpose and, even more importantly, it is established when the court orders such hearing, all proceedings in the criminal prosecution must be suspended until the issue of defendant's competence to stand trial has been determined at the special hearing (§ 1368;[19] Witkin, Cal. Criminal Procedure, § 510, p. 516).

---

[18]Of course diminished capacity, as we have earlier pointed out (fn. 7, *ante*), does depreciate a defendant's denial of guilt, and counsel, very properly, is faced with a serious tactical decision whenever such a potential "defense" exists. But again, as we have noted, the issue of tactics or strategy here begs the question since counsel failed to properly investigate in order to be in position to make a rational and informed tactical decision not to raise the issue of diminished capacity (*In re Saunders, supra,* 2 Cal.3d at pp. 1041-1042).

[19]At all relevant times, section 1368 provided that "*If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court*

██ Similarly, it is well settled that if the defendant enters a double plea of "not guilty" and "not guilty by reason of insanity," there is a bifurcated trial. The first trial is held on the issue of guilt alone, and in this trial the defendant is conclusively presumed sane. If the defendant is found guilty in the first phase of the trial, the second phase follows, the sole purpose of which is to pass upon the issue of legal sanity (§ 1026;[20] *People* v. *Cordova* (1939) 14 Cal.2d 308 [94 P.2d 40]; Witkin, Cal. Criminal Procedure, § 502, p. 508). In elaborating on the meaning of section 1026, the case law underlines that since the mental capacity to commit the crime (insofar as legal sanity is concerned) is conclusively presumed at the first phase of the trial, the evidence tending to show the existence of legal insanity is barred at that stage. This simply means that legal sanity is not at issue at the first stage, and therefore evidence showing legal insanity is not admissible at the first section of the trial (*People* v. *Wells, supra,* 33 Cal.2d 330, 351; *People* v. *Smith* (1973) 33 Cal.App.3d 51, 74 [108 Cal.Rptr. 698]). It is also significant that the question of legal sanity is not necessarily determined by the same jury that heard the evidence on the defendant's guilt. Quite to the contrary, it is well recognized that the trial court has wide discretion to determine whether the issue of legal sanity be adjudicated by the same or a different jury (*People* v. *Rupp* (1953) 41 Cal.2d 371 [260 P.2d 1]; *People* v. *French*

---

*must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded*; *and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined,* and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity." (Italics added.)

[20]The pertinent portion of section 1026 read at relevant times that "*When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty,* or if the defendant pleads only not guilty by reason of insanity, *then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court.* In such trial the jury shall return a verdict either that the defendant was sane at the time the offense was committed or that he was insane at the time the offense was committed. If the verdict or finding be that the defendant was sane at the time the offense was committed, the court shall sentence the defendant as provided by law. If the verdict or finding be that the defendant was insane at the time the offense was committed, the court unless it shall appear to the court that the defendant has fully recovered his sanity shall direct that the defendant be confined in the state hospital for the criminal insane, or if there be no such state hospital, then that he be confined in some other state hospital for the insane. If, however, it shall appear to the court that the defendant has fully recovered his sanity such defendant shall be remanded to the custody of the sheriff until his sanity shall have been finally determined in the manner prescribed by law." (Italics added.)

██

(1939) 12 Cal.2d 720 [87 P.2d 1014]; *People* v. *Foster* (1934) 3 Cal.App.2d 35 [39 P.2d 271]).[21]

The implicit argument that due to the widespread trial publicity appellant's mental state, if raised in any form, would have been common knowledge in the community, and the jury trying appellant's guilt would have been advised on the insanity issue even without receiving evidence on the matter grossly overlooks the well known fact that the law is well equipped to deal with the prejudicial effect of trial publicity. Thus, the injurious impact of trial publicity may be curtailed or eliminated —for example, by court orders restricting reporting or banning access by the media to certain confidential or prejudicial matter; by voir dire examination of the prospective jurors; through the sequestration of the jury; by admonishment or instructions that in passing on defendant's guilt the jury could consider only the evidence pertaining to that issue and could not consider any matter pertaining to a plea of not guilty by reason of insanity. That psychiatric evidence introduced in a special proceeding may be effectively kept out of public view is well demonstrated by the circumstance that there was no press publicity on the report of Dr. Andres, who visited and examined Corona in the jail at least on 10 different occasions, and whose medical findings and diagnosis were contained in court documents and discussed on the June 14, 1972, competency hearing. It also bears emphasis that Dr. Hooker's continued mental examination of Corona also escaped the attention of the news media. We incidentally note that Hawk's concern about the effect of trial publicity sounds especially hollow in light of the fact that it was Hawk himself who significantly contributed to the enhancement of mass-media coverage of the events, and in effect made renewed attempts to try the case in the press rather than in the court (see discussion, *infra*). Under these circumstances, we cannot but conclude that trial counsel's failure to raise any of the mental condition defenses was the result either of ignorance of the law or was a deliberate intentional withholding of a crucial defense rather than any informed trial tactics or strategy (cf. *People* v. *McDowell, supra,* 69 Cal.2d 737, 750; *People* v. *Welborn, supra,* 257 Cal.App.2d 513, 522).

Finally, in concluding that trial counsel's lack of diligence and ignorance of the facts and law deprived appellant of his constitutional right to effective counsel, which, under the traditional law, calls for the

---

[21]As noted in the statute (§ 1026) itself (see fn. 18, *ante*), the insanity issue "shall be promptly tried, either before the same jury *or before a new jury in the discretion* of the court." (Italics added.)

reversal of the judgment (*People* v. *Ibarra, supra,* 60 Cal.2d 460; *People* v. *Jenkins, supra,* 13 Cal.3d 749; *People* v. *Martinez, supra,* 14 Cal.3d 533), we attach special significance to the circumstance that the defenses withdrawn from the case were crucial, particularly in view of the insubstantiality of the defense actually provided by trial counsel (*In re Saunders, supra,* 2 Cal.3d at p. 1049; *In re Williams, supra,* 1 Cal.3d at p. 175; *Brubaker* v. *Dickson, supra,* 310 F.2d at pp. 38-40).

As set out in detail in the introductory part of this opinion, the evidence proving appellant's guilt, although circumstantial, was overwhelming. Nonetheless, trial counsel failed to develop any of the defenses he promised in his opening statement (i.e., the alibi defense[22] proving Corona's whereabouts on the crucial date of May 19, 1971, when Whitacre, the first victim, was murdered; that Corona had a leg infection and was not able to walk during the crucial period from the end of March to the middle of April 1971; that others also had access to the knives with which the killings were done; that the blood in appellant's van originated from an injured person who was taken by Corona to a doctor; that the killings were homosexual murders and Corona was heterosexual, having a balanced, happy marriage; that character witnesses, including a priest, would testify that Corona was a peaceful, religious man, a good father incapable of violence). He did not call a single witness to testify on appellant's behalf, but rather, offering no defense at all, submitted the matter upon the evidence produced by the prosecution. Under these circumstances the defense based on appellant's mental incompetence and legal insanity was not only a "crucial," but the "sole" defense in the case. To give up the mental incapacity defense in this situation was tantamount to a total withdrawal of any legal defense, a complete abandonment of the interest of the accused.

(B) We believe appellant's alternative argument predicated on conflict of interest is equally well taken and furnishes an additional ground for reversal.

As spelled out before, the right to counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution is a

---

[22]The only feeble attempt made by trial counsel to prove alibi was by way of cross-examination of prosecution witness Sarah Vallejo. Mrs. Vallejo testified that on the morning of May 19, 1971, appellant came to her home to pick up the rent and stayed there until about 4 p.m. while installing a door. However, Mrs. Vallejo was not certain whether it was May 19 or 20, 1971, when appellant worked on the installation of the door.

right to effective counsel. Effectiveness, however, is not a matter of professional competence alone. It also includes the requirement that the services of the attorney be devoted solely to the interest of his client undiminished by conflicting considerations (*Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457]; *Von Moltke* v. *Gillies, supra,* 332 U.S. 708; *Castillo* v. *Estelle* (5th Cir. 1974) 504 F.2d 1243; *Wilson* v. *Phend* (7th Cir. 1969) 417 F.2d 1197). ▮▮▮ While some cases take the view that a conflict of interest is so inherently conducive to divided loyalties as to amount to a denial of the right to effective representation as a matter of law (*Glasser* v. *United States, supra*; *Castillo* v. *Estelle, supra*; *Goodson* v. *Peyton* (4th Cir. 1965) 351 F.2d 905; *Zurita* v. *United States* (7th Cir. 1969) 410 F.2d 477; *People* v. *Richardson* (1972) 7 Ill.App.3d 367 [287 N.E.2d 517]; *People* v. *Stoval* (1968) 40 Ill.2d 109 [239 N.E.2d 441]), the majority hold that in the type of situation here present the defendant must not only show that there was a conflict of interest, but that he was prejudiced by it. In other words, the defendant must affirmatively establish that he has suffered some actual prejudice, and the mere possibility of prejudice is not sufficient to overturn the conviction (*Ray* v. *Rose* (6th Cir. 1976) 535 F.2d 966, 974; *People* v. *Fuller* (1974) 21 Ill.App.3d 437 [315 N.E.2d 687]; see also *People* v. *Ontiveros* (1975) 46 Cal.App.3d 110 [120 Cal.Rptr. 28]; *United States* v. *La-Riche* (6th Cir. 1977) 549 F.2d 1088; *Walker* v. *United States* (3d Cir. 1970) 422 F.2d 374).

The case at bench, however, meets both of the aforementioned criteria. One, it is indisputable that by entering into the literary rights contract trial counsel created a situation which prevented him from devoting the requisite undivided loyalty and service to his client. From that moment on, trial counsel was devoted to two masters with conflicting interests—he was forced to choose between his own pocketbook and the best interests of his client, the accused. Two, the record as a whole abundantly demonstrates that the conflict of interest unanimously condemned by case law and proscribed by the canons of ethics[23] resulted in obvious prejudice to appellant, as we now explain.

---

[23]The American Bar Association Code of Professional Responsibility, Disciplinary Rule DR 5-104(B) states: "Prior to conclusion of all aspects of the matter giving rise to his employment, a lawyer shall not enter into any arrangement or understanding with a client or a prospective client by which he acquires an interest in publication rights with respect to the subject matter of his employment or proposed employment." (See to the same effect *United States* v. *McCord* (D.C.Cir. 1974) 509 F.2d 334, 352, fn. 64.)

California Rules of Professional Conduct, rule 4, likewise provides that "A member of the State Bar shall not acquire an interest adverse to a client." (See also *Ames* v. *State Bar* (1973) 8 Cal.3d 910, 913 [106 Cal.Rptr. 489, 506 P.2d 625].)

To begin with, the detailed discussion set forth above solidly supports the conclusion that, due to trial counsel's lack of diligence and ignorance, crucial defenses were withdrawn from the case which reduced the trial to a " 'farce and a sham' " (*People* v. *Ibarra, supra,* 60 Cal.2d 460, 464; *People* v. *Jenkins, supra,* 13 Cal.3d 749, 753; *People* v. *Martinez, supra,* 14 Cal.3d 533, 538).

Secondly, and more to the point, however, the record before us bespeaks far more than mere lack of diligence and ignorance on the part of trial counsel in pursuing and developing matters constituting fundamental defenses. In actuality, in the instant case we are confronted with the unprecedented situation where trial counsel assumed a position virtually *adverse* to his client and, totally unsupported by strategic or tactical considerations, took deliberate steps to thwart the development of viable defenses available to the accused.

Thus, the evidence demonstrates that substantial psychiatric data pertaining to Corona either already existed at the time of his arrest or was developed by psychiatrists who were commissioned by others than Hawk. It was also clear that instead of using the medical findings already in his possession, Hawk ignored the Andres and Catton reports in their entirety and those portions of the Sheppard and Bromberg reports that were, or seemed to be, adverse to his predetermined goal of not raising appellant's mental condition as a defense in the case. Despite the expert recommendations that further psychiatric observation and treatment of appellant were indicated, Hawk, without seeking any expert advice, took the position that no further psychiatric tests or examinations would be conducted in the matter and in carrying out this objective he flatly prohibited any additional psychiatric observation and examination of Corona. Hawk's resistance to developing crucial medical facts pertaining to appellant's mental competence to stand trial per section 1368 reached its climax at the June 14, 1972, hearing. At that hearing, the entirely unreasonable and unheard of situation arose in which the trial court and the prosecution pressed for further psychiatric examination of appellant while trial counsel, who should have pursued the matter himself, vehemently opposed it, going so far as stating to the court that if any court order directing appellant's psychiatric examination were issued, he would defy it and would also instruct his client not to obey such order.[24]

---

[24]The illustrative portions of the record read as follows: "THE COURT: So the Court is necessarily concerned in every case where anybody is charged with a crime whether they are presently sane or not. Of course, *in the usual instance where there is no question of insanity, certainly it's raised by the defense counsel and you are asserting here most*

This position of Hawk was not only legally untenable and violative of the basic axioms pertaining to adequate legal representation, but also entirely unexplainable (short of his own adverse interest in the matter) in view of the fact that a legal competence hearing (§ 1368) is a separate procedure; that the confidentiality of that hearing could have been easily maintained; and finally that Hawk repeatedly emphasized that he had an unshakable belief that Corona was mentally competent and of sound mind.[25]

Respondent's argument that Hawk's failure and/or deliberate refusal to invoke the mental defenses in question were excusable and without prejudice because (1) he had a good faith belief that his client was innocent; (2) the medical record in his possession and his personal experience gained from his contact with Corona provided reasonable cause to believe that Corona was mentally competent and sound minded; and (3) the record on appeal fails to support the proposition that the invocation of either of the defenses in dispute would have been successful (cf. *People* v. *Miller* (1972) 7 Cal.3d 562, 569-570 [102 Cal.Rptr. 841, 498

*strenuously and vehemently that he is entirely competent and there should be no challenge to that fact, that's correct, isn't it?"* (Italics added.)

"The question is very important, because if in fact he is insane or presently not sane and unable to cooperate, then if he is convicted that point could be raised at any time, if you could reasonably urge then that the Court could have expressed a doubt, then the whole matter could be overturned. And, therefore, the Court is concerned from the outset about this matter going forward regularly in every particular."

"MR. HAWK: Your Honor, Juan Corona did not commit the crimes of which he's charged. For that reason it wouldn't make any difference whether he was sane or insane. Insanity would only be relevant if he had committed the crimes and was trying to escape the responsibility on the basis he was mentally incompetent. But in fact he is, and I am satisfied beyond any doubt whatsoever that Juan's mind is just as good as mine, and a lot of other people than I know better than that. *And I tell you right now, that if you make an order directing any psychiatrist to talk to Juan Corona I will instruct him not to talk to them at all.*" (Italics added.)

"*No examinations, Your Honor. I will not go along with any examinations.* He has been examined by Dr. Bromberg, he's been examined by Dr. Sheppard, and I am satisfied from Dr. Sheppard's report and from talking to Dr. Bromberg, and I was satisfied 5 minutes after I first spoke with Juan, that there is nothing wrong with his mind, and I'm not—*the Court can make those orders, but I will instruct Juan not to talk to anybody, and he will follow my advice.*" (Italics added.)

[25]The remark of the trial judge is especially apposite: "THE COURT: Now, I would emphasize, of course, that under the procedure and reference suggested by the Court the two questions which would be posed are as follows: Is the defendant presently able to understand the nature and purpose of the proceedings taken against him? And, is he presently able to cooperate in a rational manner with counsel in presenting a defense? *Now, you have indicated to the Court, Mr. Hawk, that you have a profound and abiding belief that your client is sane and he is not—is not insane, is not mentally incompetent, and feeling that way, I don't understand your hesitancy in recommending that the Court follow the suggested procedure.*" (Italics added.)

P.2d 1089]; *People* v. *Beagle* (1972) 6 Cal.3d 441, 458 [99 Cal.Rptr. 313, 492 P.2d 1]) must be rejected as totally groundless.

 In reply to these questions, preliminarily it must be pointed out that the adequacy of legal representation is not measured by the subjective or objective belief of trial counsel as to a defendant's innocence or the viability of certain defenses. On the contrary, the law imposes a mandatory duty upon trial counsel that the availability of the defense be determined as a result of *diligent* investigation of facts and research of law rather than personal impression ·or belief. But, even aside from this basic principle, the record negates respondent's contention on each of the aforestated grounds. Thus, during a conversation which took place among Dr. Hooker, Ed Cray, and trial counsel on December 31, 1972, Hawk expressed his subjective doubts about Corona's innocence. He stated inter alia, "I wonder if, if this guy [Corona] may not in his own mind sometime sit and wonder if he didn't do all these things and doesn't know it."

The contention that Hawk had reasonable cause to believe that the mental competence or the legal insanity defenses were not available must fail for the simple reason that, as we have spelled out in detail earlier, there was a great wealth of evidence in Hawk's possession or at his disposal, including the opinion of his own psychiatrist, Dr. Hooker, that unerringly indicated that Corona was suffering from renewed psychosis, schizophrenia and paranoia.

Respondent's contention that the failure of raising these crucial defenses was not prejudicial because they would have proved to be unsuccessful, begs the question and ignores the applicable law. The very vice of the procedure followed by trial counsel was his failure to properly investigate and develop facts which could have or would have given rise to the defense in question. Also, since the facts remained uncovered and undetected, there is no way of telling whether those facts, if fully developed, would or would not have established the defenses in dispute. If the record on appeal is defective or incomplete, it is due solely to the neglect of trial counsel. At any rate, the test of whether a criminal defendant was accorded an adequate legal defense does not depend on the potential success of the defense omitted, but rather on the consideration whether the defense withdrawn from the case was a crucial one.

As stated in *People* v. *McDowell, supra,* 69 Cal.2d at pages 750-751: "In the case before us counsel's misunderstanding of this basic rule likewise

deprived defendant of a meaningful exercise of professional judgment, and hence effective representation. *It resulted in 'withdrawing a crucial defense from the case,'* and 'thereby reduced his trial to a farce and a sham.' (*People* v. *Ibarra* (1963) *supra,* 60 Cal.2d 460, 464, 466.) *In such circumstances we may not save the judgment by speculating whether the defense would have been successful*; regardless of the apparent strength of the prosecution's evidence, a trial in which only one side of the case is heard is 'fundamentally unfair' and hence constitutes a denial of due process of law. (*Brubaker* v. *Dickson* (9th Cir. 1962) *supra,* 310 F.2d 30, 38-39.) Such a conviction cannot stand." (Italics added.)

■ Thirdly, the prejudice stemming from the conflict of interest is graphically illustrated by the widespread publicity generated or at least acquiesced in by trial counsel. The record shows that in violation of the basic rule requiring that the accused receive a fair trial by an impartial jury free from outside influences (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507]), defense counsel engaged in continuous conduct to try the case in the press, regardless of the fact that the trial publicity was injurious to the interest of his client.[26] Perhaps the most egregious example of the harmful trial publicity is the reporting on the December 18 and 19, 1972, court hearing. This hearing was held—out of the jury's presence—to rule on the question of whether the 1970 attack against Jose Romero Raya was admissible in evidence against Corona who had been one of the suspects in that case. In that incident, Raya was "chopped up" the same way as the victims found in the graves, hence he was regarded as the only victim alive. Although the hearing was held out of the presence of the jury, the press nevertheless was permitted to be present. Despite the clear prejudice to appellant resulting from the reporting of the incident in the news media, Hawk not only failed to object to the presence of the reporters, but also expressly stated that he had no intention of excluding the press from the hearing.[27]

[26]As the trial court observed in an *in camera* discussion, "Of course, I heard you [Hawk] on television last night; and it would seem to me that your attitude expressed to the press is that all of these matters should be conducted publicly."

On another occasion, the trial court also remarked, "You are making outrageous statements out there, speaking to the press and public, trying to prejudice the trial of this case and inflame the passions of anyone who may read or hear of it."

[27]The pertinent colloquy may be described as follows: "MR. HAWK: . . . . Apparently—I assume what they are really trying to do, Your Honor, is trying this matter in the press, with hopes that some of the jurors are going to see it. MR. TEJA: We didn't assume that the press was going to be present, Your Honor. MR. HAWK: Pardon? MR. TEJA: We didn't even assume that this would be held in open court, Your Honor. MR. HAWK: Well, I don't know. *I am not moving to exclude the press.* MR. FAHEY: We are not either. MR. HAWK: You can do it any way you want; but—MR. TEJA: *We assumed that the defense would exclude the press.* MR. HAWK: *Well, you assumed wrong.*" (Italics added.)

▇▇▇ Fourthly, and finally, appellant's cause was prejudiced by the opening statement of trial counsel in which he promised to present to the jury a multitude of defense evidence disproving the prosecution's case (i.e., alibi by appellant himself and other witnesses; psychiatric evidence on the homosexual motivation of the crimes; a host of character and other witnesses to rebut various aspects of the prosecution's case). ▇▇▇ Although the opening statement by counsel at the close of the prosecutor's opening statement is permitted by statute (§ 1093, subd. 3), since such statement commits the defense to the pursuit of certain conduct even before the prosecution's evidence is fully known or submitted, the making of such statement is ill advised, particularly where, as here, the defense has a weak case (*Tahl* v. *O'Connor* (S.D.Cal. 1971) 336 F.Supp. 576, 582). ▇▇▇ The controlling principle has been laid down in *People* v. *Cryder* (1949) 90 Cal.App.2d 194 [202 P.2d 765], where the court stated, at page 204, as follows: "As to point (2) section 1093 of the Penal Code in prescribing the order of proceedings at a trial, makes no mention of an opening statement by the accused. But subdivision 2 says that the district attorney 'must open the cause *and offer evidence* in support of the charge.' Subdivision 3 provides that the defendant 'may *then* open the defense and offer his evidence.' *Such language impliedly commands silence on the part of the accused until the prosecution shall have introduced his proof. . . .*" (Italics partially added.)

The damaging effect of a premature opening statement by the defense is well illustrated in the case at hand. Thus, counsel, in his opening statement, committed himself to the introduction of a variety of evidence which was not fully developed at the time the statement was made and/or which became irrelevant, meaningless or obsolete after the submission of the People's case. When, due to the foregoing reasons or any other considerations, Hawk ultimately decided to forego all the defenses promised and submitted the matter upon the evidence introduced by the prosecution, he opened the gate to legitimate, devastating comments on the part of the prosecution. ▇▇▇ Although, under the rule pronounced in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], the prosecutor may not make any reference to defendant's failure to take the stand on his own defense, it is now well settled that the *Griffin* rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. (*People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959]; *People* v. *DeVaney* (1973) 33 Cal.App.3d 630, 636-637 [109 Cal.Rptr. 276]; *People* v. *Chandler* (1971) 17 Cal.App.3d 798, 805-806 [95 Cal.Rptr.

146]). As exemplified below,[28] the prosecution availed itself of the opportunity by commenting on the failure of the defense to provide the promised evidence and thereby dealt a devastating blow to appellant's cause.

---

[28]By illustration, we cite the following portions of the record:

"*In his opening statement the defense lawyer promised you he would prove a number of things none of which he proved.*

"He promised you first that Mr. Kamp, one of the victims in this case, was killed by a 116 grain Winchester Western bullet. We know from the evidence that this is not true.

"He told us that neither of the defendant's two bloody hunting knives could have caused the stab wounds in the dozen and a half or so victims in this case who were stabbed." (Italics added.)

"The defense apologized in his opening statement, in Mr. Hawk's opening statement to the ladies of the jury for having to bring experts here to talk about machismo, activo homosexuals, . . . the fact that the defendant is hopelessly heterosexual, the evidence that he was going to introduce that these were homosexual murders, that these victims were in many cases, or at least in some cases, men who were killed with their pants halfway off or halfway on.

"There is no such evidence whatsoever before you for your consideration. *None of this which was promised you was provided by the defense. . . .*

"*The defense promised you experts but produced none.*" (Italics added.)·

"*The defense also promised you character evidence that the defendant was an honest, peaceful, quiet man. You were promised that you'd hear the testimony of a Father Bishop, of Mr. Sullivan, of Mrs. Corona, of the defendant's family.*

"*Well, none of these people testified. . . .*

"*The defense's unfulfilled promises here amount to quite a few,* ladies and gentlemen. That the bullet from the defendant's gun, that a bullet from the defendant's gun could not have killed William Emery Kamp; that an employee bleeding in the van accounted for the massive amounts of blood which were found in that vehicle; that the defendant's leg infection would have prevented his having committed these particular murders during a certain period of time.

"All of these things about Emilio Rangel, all of the allegations about homosexuality, its involvement in the killings and heterosexuality of the defendant. Evidence, for that matter, that the defendant Juan V. Corona didn't beat his wife and children, things which were promised you but which things we have never heard here as evidence in this particular matter. . . .

"*It is easy for an attorney to talk a great deal; it is easy for an attorney to promise a great deal; producing cold, hard evidence of fact is sometimes a great deal more difficult.*

"In this connection, also, Mr. Hawk's opening statement is not evidence before you. It consisted of his statement of the evidence that he intended to produce, none of which was forthcoming.

"*Where are the medical records he referred to? Do they exist? Where is any evidence regarding this Emilio Rangel who was the defendant's employee? Where is the alleged public record about the employee of the defendant who bled in the van?*

"*Where is this expert testimony about homosexuality and heterosexuality?*

"*Where is the character evidence that was promised here?*" (Italics added.)

"*The reasonable, logical conclusion from these facts,* which the defendant has not bothered to attempt to explain, ladies and gentlemen, *together with all of the other evidence in the case,* for example, the blood in the van, the bloody weapons in the defendant's possession, *is that the defendant drove Kenneth Whitacre to his grave in the little yellow van* that has the license number 107 BVR . . . ." (Italics added.)

In sum, the record before us bears out the dual proposition that a conflict of interest was created between appellant and his trial counsel and that said conflict resulted in manifest prejudice to appellant. Such conduct constituted not only an outrageous abrogation of the standards which the legal profession has set for itself and upon which clients have a right to rely, but also rendered the trial a farce and mockery calling for reversal of the conviction and requiring a new trial.

(C) In view of the foregoing conclusion, the additional issues raised by appellant do not require an extended discussion. Appellant's contention that the trial court should have held a hearing as a matter of law under section 1368 lacks any merit for two reasons.

One, contrary to appellant's insistence, the record establishes that Judge Hauck (or Judge Patton for that matter) never expressed doubt as to Corona's mental state, and the order attributed to Judge Hauck was not made and/or was kept in abeyance upon the insistence of trial counsel.

Two, it is well recognized that defendant is entitled to a section 1368 hearing as a matter of law only if there is substantial evidence showing his mental incompetence (*Pate* v. *Robinson* (1966) 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836]). As the court put it in *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942]: "*Pate* v. *Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with *substantial evidence* that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense." (Italics added.) According to case interpretation, the substantial evidence test is satisfied only if a psychiatrist or qualified psychologist who has had sufficient opportunity to examine the accused, states under oath with particularity that in his professional opinion the accused is incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting his own defense or cooperating with counsel (*People* v. *Pennington, supra*, at p. 519; see also *People* v. *Beivelman* (1968) 70 Cal.2d 60, 71 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Laudermilk, supra*, 67 Cal.2d 272). While Dr. Catton expressed his doubts as to whether appellant was able to assist his counsel in preparation of a just and rational defense, the record shows that due to trial counsel's negligence or reluctance this medical opinion was not submitted to the court. Since the record fails to show substantial evidence with respect to appellant's mental incompetence, the court was under no duty to hold a hearing pursuant to section 1368.

 Appellant's next contention that the trial court committed error in refusing to admit testimony of several witnesses offered to dispute and controvert the truthfulness of the affidavits supporting the search warrants is, however, well taken.

 In *Theodor v. Superior Court* (1972) 8 Cal.3d 77, 100-101 [104 Cal.Rptr. 226, 501 P.2d 234], our Supreme Court held that, pursuant to a section 1538.5 motion, a defendant may challenge the factual veracity of an affidavit in support of a warrant, and if the statements contained in the affidavit are demonstrated to be false and the affiant was unreasonable in believing the truth of the information, those facts must be excised from the affidavit and the probable cause must be tested from the remaining truthful portion of the affidavit.

In elaborating on the above holding, the Supreme Court explained that if the defendant challenges the accuracy of an affidavit, there are two preliminary issues to be resolved: (1) did the affidavit contain factual misstatements? (2) if so (and if the misstatements were not intentional), did the affiant nevertheless act reasonably in believing the facts to be true? Since the state has sustained its initial burden of the truthfulness of the facts by virtue of the affidavit itself, under well established rules the defendant must carry the burden of demonstrating the inaccuracy or falsity of the allegations if he attacks the affidavit on the said grounds. Consequently, before a hearing is required to test the veracity of an affidavit, the defense must relate, with some specificity, its reasons for contending that the affidavit is inaccurate (*Theodor v. Superior Court, supra,* 8 Cal.3d at pp. 101-103).

 In the case at bench appellant made a section 1538.5 motion to suppress evidence, and in the June 7, 1972, proceedings he proffered the testimony of several witnesses for the purpose of challenging the factual statements of the affidavits attending the search warrants. However, the trial court erroneously ruled that it would be improper to call witnesses to dispute the accuracy of the affidavits and consequently denied the motion. In view of the fact that under *Theodor* an initial showing of inaccuracy has to be made before a hearing is required, and since the record on appeal does not include the transcript of the June 7, 1972, proceedings, this court, on its own initiative, attempted to obtain the transcript of the offer of proof made at the June 7, 1972, proceedings. Despite those efforts, however, we have not been able to acquire this important transcript. In the absence of that record we are, of course, unable to determine whether the denial of the hearing constituted

prejudicial error. If, on retrial, appellant offers evidence to challenge the factual allegations of the affidavits supporting the search warrants, the court should proceed in accordance with the precepts enunciated in *Theodor* and as expressed herein.

■ Appellant lastly contends that the admission of the testimony of Jose Romero Raya was also erroneous. As mentioned before, on February 24, 1970, Raya was severely beaten in the Guadalajara Bar, Marysville, and as a result of the beating bears scars to his face and head. In effect, appellant's argument is twofold: (1) the evidence provided by Raya was irrelevant, and (2) its relevance, if any, was outweighed by its prejudicial effect. Neither of these arguments may be accepted.

The record discloses that Raya's testimony was not admitted to prove the fact that he was assaulted in the bar (which would have been clearly prejudicial), but rather for the purpose of showing that on the night of the assault Corona offered him and his companion work on the Sullivan ranch and asked the two men to ride out to the ranch. This testimony of Raya was patently relevant, because the record revealed that appellant had made similar offers to a number of the victims (i.e., Jackson, Smallwood, Allen, Riley) who, contrary to Raya, accepted the offer, rode off with appellant and were never seen alive again. Also, Raya's name and the date of the incident appeared in the green ledger along with the names of several victims. (See fns. 3, 4, *ante.*) In short, Raya's testimony was highly relevant because it tended to show how the murderer recruited his victims, and also because it shed light on the probative value of the ledger introduced in evidence.

■ As far as the inflammatory nature of Raya's scars is concerned, suffice it to say that the determination of whether the probative value of otherwise relevant evidence is outweighed by its prejudicial effect is within the sound discretion of the trial court, and absent a clear abuse of discretion, the ruling of the trial court will not be disturbed on appeal (Evid. Code, § 352; *People* v. *Terry* (1970) 2 Cal.3d 362, 403 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Seastone* (1969) 3 Cal.App.3d 60, 64-65 [82 Cal.Rptr. 907]). ■ Appellant has failed to show such abuse.

In view of the conclusion reached in the case, the additional issues raised by the parties need not be decided.

*Disposition:*

(1) The judgment in 1 Criminal 12401 is reversed.

(2) The writ in 1 Criminal 15257 is granted. Petitioner is remanded to the custody of the Solano County Superior Court for further proceedings in accordance with the views expressed in this opinion.

Taylor, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied June 7, 1978, and the opinion was modified. On July 10, 1978, the judgment was modified. Both modifications have been incorporated in the above printing. Respondent's petition for a hearing by the Supreme Court was denied July 20, 1978. Bird, C. J., was of the opinion that the petition should be granted.